494 P.2d 44

**COUNTY OF MARICOPA, a body politic,**
**Appellant,**

v.

**WALSH AND OBERG ARCHITECTS, INC.,**
a corporation, Appellee.

**No. 1 CA–CIV 1613.**

Court of Appeals of Arizona,
Division 1,
Department B.

Feb. 29, 1972.

Rehearing Denied April 4, 1972.

Review Denied June 6, 1972.

Stidham & Galusha, by Charles C. Stidham, Phoenix, for appellant.

Jennings, Strouss & Salmon, by T. Patrick Flood, Phoenix, for appellee.

JACOBSON, Judge.

The sole question presented in this appeal is whether the trial court applied the correct measure of damages in awarding judgment to the appellant-plaintiff, County of Maricopa (County), against appellee-defendant, Walsh and Oberg Architects, Inc., (Architect).

Some time prior to September 21, 1962, the County employed the Architect to prepare plans and specifications for the new county complex located in downtown Phoenix, Arizona. On September 21, 1962, the Architect submitted such plans and specifications to the County, construction on the complex commenced in December, 1962, and was completed and accepted by the County in September, 1964.

A portion of this construction consisted of a steel reinforced concrete slab approximately 400 feet long by 200 feet wide by nine to ten inches thick laid over an underground parking area. The specifications for this slab provided that the "concrete shall be impermeable." On top of this slab were placed sidewalks, dirt, rock, shrubs, grass, fill, statues, benches, surface lighting, and a drainage system. In other words, the top of the slab was landscaped. Imbedded within the slab were aluminum conduits which carried an electrical system.

Following acceptance of the complex by the County, it was ascertained that cracks had developed in the underside of the slab (the roof of the underground parking area) and that moisture was leaking into the parking area. After several attempts to correct the situation, the contractor disavowed any further responsibility for the situation and the County brought suit against both the Architect and the contractor, seeking damages for this condition.

Evidence adduced at trial indicated that the cracking and leakage problems were primarily from two sources. The first of these was the inability of the calking material specified by the Architect to sufficiently bond the expansion joints in the slab to make them waterproof. The second and major cause of the leakage was the specification prepared by the Architect that a substance known as Anti-Hydro was to be added to the cement in the slab to make it impervious to moisture. Anti-Hydro contains the chemical, calcium chloride. It was shown that when the calcium chloride came into contact with the aluminum conduits imbedded within the concrete and was alternately moistened and dried, a chemical corrosion of the aluminum occurred. This resulted in the aluminum expanding several times its volume and as the aluminum was in turn dissipated as a result of the corrosion, cracks developed which allowed leakage.

The evidence also showed that in order to absolutely insure the waterproof character of the slab, it would now be necessary to remove all the landscaping on top of the slab and cover it with a waterproof membrane, and then replace the landscaping. The cost of such a procedure varied from $350,710 (Architect's figure) to $498,169 (County's figure). It was estimated that 75% of these costs would be incurred in the removal of the landscaping and its replacement.

In addition to the above figures for the repair of the leakage condition, the County, in rebuttal to figures submitted by the Architect as to the cost of future maintenance of the structure, introduced evidence as to the cost of a cathodic protection system[1] which could be installed to prevent further corrosion.

Evidence was also presented by the County as to the cost of installation of drip pans on the undersurface of the slab, replacement of electrical circuits, repair of any damaged vehicles and other incidental damages over the life expectancy of the entire complex. These costs were estimated to be the sum of $107,358, the exact amount of the judgment herein.

The trial court, after close of all evidence and arguments, granted judgment in favor of the contractor and granted judgment in favor of the County against the Architect. The transcript of the trial judge's remarks, in awarding damages, reads as follows:

"Technically, the County is entitled to the cost of remedying the defect in the slab, which the evidence showed varied between $358,000 and $498,169. However, the feeling of the Court is that such a large Judgment would indeed constitute economic waste. It seems to the Court that by the installation of cathodic protection, further deterioration of the aluminum can be stopped and any rusting of the steel rebars can be prevented. Sufficient allowance can be made for putting of drip pans to collect leakage and an award made to the County for the added cost of maintenance, rewiring, et cetera. The Court therefore finds that the County is entitled to recover of and from the architect, the sum of $107,358. . . ."

No appeal has been taken by the Architect, nor has the County appealed the granting of judgment in favor of the contractor. The sole appeal is by the County from that portion of the judgment fixing the amount of damages, the County presenting the following question for review:

"Having found plaintiff entitled to recover, did the court apply the correct rule as to measure of damages by holding that 'cost of repair' would result in economic waste?"

The "cost of repair" rule referred to in the above question relates to the general rule of damages applicable to breach of construction contracts, that is, damages are awarded based upon the reasonable cost of construction and completion in accordance with the contract. Sorensen v. Robert N. Ewing, General Contractor, 8 Ariz.App. 540, 448 P.2d 110 (1968).

The concept of "economic waste" as it relates to changing the general rule as to damages for breach of a construction contract has been succinctly captured by comment (b) to Restatement of Contracts, § 346(1) (1932):

"The purpose of money damages is to put the injured party in as good a condition as that in which full performance would have put him; but this does not mean that he is to be put in the same specific physical position . . .. There are numerous cases . . . in which the value of the finished product is much less than the cost of producing it after the breach has occurred. Sometimes defects in a completed structure cannot be physically remedied without tearing down and rebuilding, *at a cost that would be imprudent and unreasonable. The law does not require damages to be measured by a method requiring such economic waste.*" (Emphasis added.)

If economic waste is present, the effect is to award damages on the basis of the difference in value of the building had it been completed in accordance with the contract and the value of the building as

---

1. The cathodic protection system is a method by which a slight electrical current is introduced into the cement slab which chemically would counteract the corrosive process.

erected, rather than on the basis of reasonable cost of completion to conform to the contract. Restatement of Contracts § 346(1) (1932).

The conceptual defense of economic waste has been recognized in Arizona. Blecick v. School District No. 18 of Cochise County, 2 Ariz.App. 115, 406 P.2d 750 (1966).

■ A corollary to the rule on economic waste · is that the one urging economic waste has the burden of affirmatively and convincingly proving economic waste would result from remedying the defects. Blecick v. School District No. 18 of Cochise County, *supra*; Corbin on Contracts, Vol. 5, § 1089, et seq. (1964).

■ This court must thus determine whether there was sufficient evidence before the trial court to show affirmatively and convincingly that economic waste would result from application of the cost of repair rule of damages. From our review of the record, this determination must be in the affirmative.

At the time of trial, the County had been living with the problem of the leaking underground garage roof for approximately six years. During this period of time, the only problems experienced by the County resulting from the non-waterproof roof was damage to automobiles caused by water leakage and damage to the electrical system. It appeared as to the last item that 40 percent of the electrical system originally imbedded in the concrete slab had been replaced at a total cost of $3,636.-23. Evidence also showed that this replacement had taken the form of installing electrical conduits underneath the slab and bypassing the imbedded electrical system. The evidence further disclosed that this method had proven satisfactory. The estimated cost of replacement of the balance of the electrical system was $8,429. Testimony also showed that damage to automobiles from water leakage could be eliminated by installation of drip pans on the underside of the slab at a total cost of $14,-000, and in fact this· remedy had already

been utilized by the County to some extent during the past six years at a cost of $2,500. With the addition of the cathodic protection system to prevent further corrosion, no further damage to either the steel reinforcement in the slab or the aluminum conduits imbedded therein would occur.

While there was some testimony that in the future the underground garage might be converted to office space which was now lost because of the leakage, this testimony was more than offset by evidence that the same long-range plans of the County envisioned the construction of three additional stories on top of the slab, thus negating the necessity of a waterproof slab.

In addition, there was some evidence that the County, in fact, had no intention of actually removing the landscaping and installing the waterproof membrane.

When this evidence is considered with the cost involved in placing a waterpoof membrane over the slab, 75 percent of which would be expended in merely removing and replacing the landscaping—approximately $375,000 (using the County's figures), or three times the cost of actually minimizing the problems caused by the defect—we must say there was sufficient evidence before the trial court to find that economic waste would result in applying the cost of repair rule of damages.

Admittedly, the roof of the underground garage with the addition of electrical conduits and drip pans may not be as aesthetically pleasing as contemplated by the original plans. However, this was a consideration for the trial court in determining whether the expenditure of a third of a million dollars merely to remove the landscaping was justified, and thus whether economic waste would occur. Considering the uses of a garage, we cannot say the trial court's determination in this regard was incorrect.

Having determined that the trial court was justified in finding economic waste, the County does not question whether this rule was correctly applied in determining the damages actually awarded. For this

reason we do not pass on this question. (See generally on this subject Corbin on Contracts, Vol. 5, § 1090 (1964).)

For the foregoing reasons, the judgment of the trial court is affirmed.

HAIRE, P. J., and EUBANK, J., concur.