HARRIET CHERIE LONG, AGE SIX (6) YEARS, b/n/f RAYMOND LONG, AS NEXT FRIEND, PARENT AND NATURAL GUARDIAN *v.* EDWARD M. JOHNSON, M.D., AND UNION HOSPITAL, INC.

[No. 1-277A31. Filed October 5, 1978. Rehearing denied December 7, 1978. Transfer denied March 26, 1979.]

*George B. Tofaute, Geoffrey G. Creason, Tofaute & Spelman*, of Terre Haute, for appellant.

*Geoffrey Segar, Ice, Miller, Donadio & Ryan*, of Indianapolis, for appellee Johnson.

*John P. Price, Jon D. Krahulik, Bingham, Summers, Welsh & Spilman*, of Indianapolis, for appellee Union Hospital, Inc.

LYBROOK, P.J. — In a medical malpractice action plaintiff Harriet Cherie Long (Cherie) by her next friend (and father) Raymond Long appeals from a judgment entered on a jury verdict in favor of defendant Edward M. Johnson, M.D. (Johnson) and from the trial court's entry of judgment for defendant Union Hospital (Union) notwithstanding the jury's verdict against Union and in favor of Cherie.

The facts most favorable to the jury's verdict in favor of Cherie and against Union, and to the verdict (and the trial court's judgment) against Cherie and in favor of Johnson, are as follows:   Cherie's mother, Wanda

Long (Wanda), arrived at Union Hospital and was admitted to the labor room at 4:45 A.M. on September 17, 1968, to give birth to her thirteenth child, Cherie. All of Wanda's other children had been born vaginally and without complication; furthermore, none had ever experienced any abnormal physical or mental impairment.

Wanda was "prepped," and Johnson performed a vaginal examination at 5:05 A.M. to determine her progress. Johnson then artificially ruptured Wanda's amniotic membrance.[1] At that time Wanda's bag of water contained clear amniotic fluid. The quantity was noted as "a very large amount." Johnson then told her, "It will be a little while," and he left, saying that he was going to the doctor's room. As he walked out he told the nurse on duty, "Watch her contractions; keep an eye on the heart tones." In fact, monitoring of expecting patients in the hospital was regularly the duty of the nursing staff, unless the attending physician was actually present and was personally monitoring the patient.

By 7:05 A.M. Wanda's amniotic fluid had become stained with meconium, which, according to the testimony of various experts, was a "danger sign," signalling that the baby, while in the uterus, may have undergone "an episode of distress which resulted in the involuntary emptying of the bowel of the baby into the amniotic fluid . . ." The nurse informed Johnson of the meconium staining, and he, who was not in the labor room at the time, proceeded to that room where he performed another vaginal examination. At this time Johnson could find nothing out of the ordinary, other than the meconium staining.

At 8:00 A.M. Nurse Connor noted on Wanda's labor room chart that her contractions were irregular; however, Wanda remarked at that time that she felt comfortable. At 8:05 A.M. or 8:15 A.M. Johnson performed another vaginal examination, and Nurse Connor noted that Wanda's dilation was still at four centimeters, where it had been since 5:00 A.M. The fetal heart tones were noted as good.

---

1. Testimony differed on the appropriateness of this measure taken by Johnson; however, since the jury found in favor of Johnson, we are bound to accept that testimony which was in favor of his action. *Huff v. Travelers Indemnity Company* (1977), 266 Ind. 414, 363 N.E.2d 985.

At 8:20 A.M. Nurse Connor began administration of the drug Pitocin[2] through intravenous drip in order to accelerate the labor process. Pitocin was described as a very dangerous drug; further testimony showed that Pitocin was commonly used in Terre Haute in 1968, to "induce" labor. One recognized hazard in using Pitocin is overstimulation of the uterus, which can result in tearing or rupturing of the uterine wall, and for this reason all patients receiving Pitocin must be monitored continuously and very closely.

Expert testimony established that in Terre Haute, in 1968, (when Cherie was born) the only way of monitoring a patient's contractions was by having a nurse sit beside the patient with her hand on the patient's abdomen to determine the frequency and intensity of the contractions. Since the nurses at Union were charged with the duty of monitoring patients in labor, they were responsible likewise for monitoring the effects of Pitocin on expectant mothers, unless the attending physician was present and personally monitoring the patient.

At this point we reach a most critical dispute in the facts of this case. Nurse Connor, who apparently attended Wanda throughout the crucial period, had no recollection of its events; in her testimony she had to rely almost exclusively on the hospital's records and notes, which were taken, in part, by her. Wanda, the only other person who was "present" during the *entire* critical period[3] (approximately 8:20 A.M. when the Pitocin was started, to 10:20 A.M., when Cherie was born) testified that no one, neither the doctor nor the nurse, continuously monitored her contractions in either the labor room or the delivery room by placing a hand on her abdomen; instead the nurses would ask Wanda whether she was experiencing any pain. Her hospital chart reflected no monitoring. Wanda did testify that she "dozed" from time to time, but that she would always wake up when she was touched, or when she would have a contraction.

---

2. Pitocin is a Parke-Davis trade name for the hormone oxytocin.

3. Nurse Thelma Jones went off duty at 7:00 A.M.; Johnson was not present when the Pitocin was started, nor was he present when Wanda first experienced severe pain; Nurse Hackler was present at 8:00 A.M., but subsequently left and did not return until 9:00 A.M. Again, the record conflicts continuously on these points, but we are bound by that evidence favorable to the jury's verdict. *Huff, supra.*

Although the Pitocin had been administered pursuant to Johnson's orders, he was not present when the drug was started, according to Wanda's testimony.

In September of 1968 there was no hospital regulation requiring the prescribing doctor to be present when Pitocin is given; the hospital only required that the prescribing doctor be somewhere in the hospital during its administration.

According to Wanda's hospital chart, as interpreted by expert testimony, the Pitocin was running from 8:20 A.M. to 10:50 A.M.[4]

Wanda was transferred to the delivery room at approximately 9:00 A.M., where she was given a saddle block anesthetic. Following the administration of the anesthetic Johnson left the delivery room to "scrub up" for the delivery; he testified that he was gone for only two or two and one-half minutes. At approximately 9:15 A.M. Wanda was put in stirrups, and all then waited for the arrival of her baby. By 9:40 Wanda had still not delivered, and Johnson had her removed from the stirrups and laid flat on her back pending a decision on what to do next.

At 9:46 to 9:50 there was a sudden change in the contour of Wanda's abdomen, and, according to Wanda's testimony, she experienced a terrible pain in the pit of her stomach. Her abdomen then resembled the shape of an hourglass, a condition diagnosed by Johnson (and later by other experts) as a Bandl's ring, which is a strong contraction of the uterus which is not released. Expert testimony established that a Bandl's ring is the precursor of a uterine rupture. Expert testimony further established that when abnormal contractions begin to develop they may be reversed very quickly by stopping or slowing down the flow of Pitocin.

---

4. Once again there is considerable conflict in the record regarding the question whether Pitocin actually was running throughout the entire period; however, we find sufficient evidence to support the proposition that it was. Dr. Johnson testified that it may have been. The hospital's record reflects that the Pitocin was begun at 8:20 and discontinued at 10:50 A.M. The hospital required, as standard procedure, that all orders of a physician to begin or discontinue the administration of Pitocin be noted on the chart. Wanda testified that the bottle of Pitocin (as it had been identified to her by the nurse on duty) went with her to the delivery room and later to surgery. Since expert testimony interpreting Wanda's charts indicated that the drug was flowing from 8:20 to 10:50, we are bound to accept that fact to the extent that it supports the jury's verdict, although there may be evidence to the contrary. *Huff, supra.*

Johnson decided to take Wanda to the operating room immediately to receive a general anesthetic which would relieve the contractions; if the anesthetic was not successful, Johnson then could deliver Cherie by Cesarian section.

Wanda was taken from the delivery room at 10:05 A.M.; she arrived in the operating room at 10:15 A.M. By the time Johnson performed a Cesarian section Wanda's uterus had ruptured,[5] Cherie was expelled from the uterus into the abdomen, and her oxygen supply was compromised, resulting in severe and permanent brain damage. More specifically, she has a condition known as cerebral palsy.

Although Cherie is mentally alert, and she has no physical impairment, due to the anoxic condition (lack of oxygen) in which she was born, Cherie has a severe neurological impairment.

Following a trial to the jury, Cherie received a $350,000 verdict against Union, while Johnson received a verdict in his favor. Judgment was entered on the verdict in favor of Johnson, and although the trial court entered judgment on the jury's verdict in favor of Cherie and against Union, it subsequently granted Union's motion to correct errors and entered judgment in favor of Union notwithstanding the verdict in favor of Cherie.

Cherie alleges the following errors against Johnson:

(1) That the judgment is contrary to law.

(2) That the judgment is not sustained by the weight of the evidence.

(3) That that trial court erred in giving defendant's instruction number 8.

(4) That the court erred in giving defendant's instruction number 4.

Errors alleged against Union include:

(5) That the weight of the evidence does not support the granting of Union Hospital's motion for judgment on the evidence,

5. Some expert testimony placed the time of rupture at the moment when the "hourglass" shape of the abdomen first appeared.

prayed for in its motion to correct errors, but instead favors finding for the plaintiff.

(6) That the court's entry of December 1, 1976, granting Union's motion to correct errors was in violation of TR. 59(E) in that it did not show why judgment was not entered upon the evidence as is required by the rule.

(7) That the court's entry of December 1, 1976, granting Union's motion to correct errors was contrary to law in that the court misapplied the legal test for the entry of a judgment pursuant to TR. 59(E).

(8) That the court's decision in the entry of December 1, 1976, is contrary to law in that the court misapplied the legal test for the granting of a motion for judgment on the evidence pursuant to TR. 50.

(9) That TR. 59(E) and the Indiana case law allowing a judge to set aside a jury's verdict because the judge determines that the verdict is found to be clearly erroneous as contrary to or not supported by the evidence is unconstitutional under both the United States and Indiana Constitutions, as it deprives the plaintiff of her constitutional right to trial by jury.

(10) That the verdict of the jury upon which judgment was rendered against Union was inadequate.

The first two of these alleged errors assert that the weight of the evidence was against the jury's verdict in favor of Johnson, and therefore the verdict was contrary to law. As to this argument, we must set forth the often repeated appellate standard of review that in determining whether a judgment is supported by sufficient evidence, the reviewing court neither weighs the evidence nor resolves questions of credibility of witnesses. This court views only the evidence most favorable to the verdict together with all logical inferences flowing therefrom. *Utica Mutual Ins. Co. v. Ueding* (1977), 175 Ind.App. 60, 370 N.E.2d 373; *Stock v. State* (1974), 162 Ind.App. 461, 319 N.E.2d 871.

The evidence presented in the case shows differing views of what

actually took place: whether Johnson was present in the delivery room with the plaintiff's mother at all times; whether Johnson properly examined and monitored plaintiff's mother in the delivery room; whether Pitocin was being administered intravenously to the plaintiff's mother in the delivery room; and whether Johnson was negligent in prescribing Pitocin in view of at least three contraindicative factors—Wanda's age (43), the fact that she had given birth to twelve other children, and the presence of the meconium staining. The experts' opinions differed widely in regard to the wisdom of Johnson's actions. However, the jury determined these and other questions in favor of Johnson in rendering its verdict for him, and it is not the province of this court to reassess the jury's determination of witness credibility on these issues. *Utica Mutual Ins. Co., supra; Stock, supra.* We find that in light of the conflicting evidence on the issue of Johnson's negligence, the jury was entitled to believe any or all of Cherie's evidence against Johnson or to disbelieve it entirely. It hardly need be pointed out that Cherie had the burden of proof on these issues, *Clayton v. Penn Central Transportation Co.* (1978), 176 Ind.App. 544, 376 N.E.2d 524, and where the evidence presented conflicts, we are bound by that evidence which supports the jury's verdict. *Utica Mutual Insurance Co., supra.*

Plaintiff's next alleged error questions the propriety of the trial court's giving of Johnson's tendered instruction number 8 concerning alternative treatment methods. Exactly what aspect(s) of the instruction appellant is questioning is not clear either from the motion to correct errors and the memorandum in support thereof or from her appellate brief.

The drafting of appellate briefs is dealt with in Ind. Rules of Procedure, Appellate Rule 8.3(A)(7). Those errors raised in the motion to correct errors, this rule provides, and which the appellant intends to raise on appeal, shall be dealt with in the argument section of the brief devoted thereto as follows:

"The argument shall contain the contentions of the appellant with respect to the issues presented, the reasons in support of the contentions along with citations to the authorities, statutes, and parts of the record relied upon, and a clear showing of how the issues and contentions in support thereof relate to the particular facts of the case under review."

As with noncompliance with the rules relating to the drafting of motions to correct errors, noncompliance with the rules relating to the drafting of briefs can result in the waiver of errors on review. Errors alleged by defendant but not presented and argued in the argument section of defendant's brief are waived. *See, e.g., Jenkins v. State* (1975), 263 Ind. 589, 335 N.E.2d 215; *Loza v. State* (1975), 263 Ind. 124, 325 N.E.2d 173.

Although appellant mentions her objection to the trial court's giving Johnson's tendered instruction number 8 in her first motion to correct errors, she makes absolutely no mention at all of her objection in her appellate brief. No authorities are cited to support plaintiff's view of this issue, and no argument on the issue is presented. The issue is thus waived.

Plaintiff next asserts that the trial court's giving of Johnson's tendered instruction number 4, as amended by the court, as a final instruction was a misstatement of the standard of medical care required by a physician to the plaintiff. The instruction reads:

"You are instructed that in determining: (a) the standard of medical care and skill applicable to Dr. Johnson's care in this case, and (b) whether such standard was breached (i.e. whether Dr. Johnson deviated from such standard), and (c) whether any alleged breach was a proximate cause of any injury to the plaintiff, you may consider only the evidence presented by the doctors, including Dr. Johnson, called as expert witnesses."

In reply to this instruction, the plaintiff objected, saying that the instruction was:

"A misstatement of the law in that it informs the jury that they can consider only the evidence of the doctors in this case and using such phrase is misleading to the jury and confusing in that a reasonable interpretation of such instruction would leave the jury to exclude from consideration all the other testimony of witnesses who were not doctors in this action. . . ."

We cannot agree with this analysis by the appellant. The appellant seems to feel that testimony of persons of "ordinary intelligence, sense and judgment" should be admissible to determine the standard of medical care. This is simply not the law.

In *Cochrane v. Lovett* (1975), 166 Ind.App. 684, 337 N.E.2d 565 at 566, the court stated in an instruction to the jury in a medical malpractice case:

"In deciding whether the doctor possessed and used the degree of skill and learning required, and whether or not such act or failure to act was the proximate cause of plaintiff, Douglas B. Cochrane's injuries, you may consider only the evidence presented by the doctors called as expert witnesses. However, expert evidence is not required where the treatment or the results thereof are of such character as to warrant an inference of want of care by persons of ordinary intelligence, sense and judgment."

To this instruction the plaintiff in *Cochrane* objected, stating that:

". . . *[I]n determining whether the doctor had used the degree of skill you're not bound by the expert testimony.* In determining what the degree of skill and care he was required to use, I think you are bound by expert testimony, but you are not bound by expert testimony in deciding if he used it because you are entitled to believe the plaintiff's story as opposed to the doctors." (Original emphasis.)

Although the *Cochrane* case was decided on a procedural issue, this court stated in that case, at 570, that:

"Even had Cochrane not waived the question he would have been confronted with *Adkins v. Ropp* (1938), 105 Ind.App. 331, 14 N.E.2d 727, and other cases, which have expressed approval of [such] language. . . . In *Adkins* the court said:

'. . . The general rule in malpractice cases, is that, in determining whether the physician and surgeon has [sic] exercised ordinary skill and care in the diagnosis of the disease and treatment of the patient and the result obtained thereby, the jury must be guided *solely* by the testimony of physicians and surgeons because of the scientific nature and character of the questions usually involved in such cases, and the jury cannot set up standards of skill and care of its own.'" (Original emphasis.)

Certainly, in this case, the statements of lay persons, nurses, hospital

employees, etc., are admissible to determine what Johnson actually did or did not do, and, as such, should be considered by the jury. The instruction in question does not exclude the jury's consideration of such evidence; it merely emphasizes the necessity for only physicians, or other medical experts, to testify about the standard of skill and care required of doctors in the locality, and whether or not such was breached under a particular set of circumstances. There is no reason for the jury being misled into believing that only physicians and surgeons could testify as to what Johnson did or did not do, as opposed to the necessity of physicians and surgeons, exclusively, testifying about the standard of skill and care required of doctors in the locality. Therefore, the trial court committed no reversible error in giving this instruction.

We now turn our attention to those allegations of error pertaining to Union Hospital; however, due to our resolution of the case, we need discuss only the following:

(1) Whether the evidence was sufficient to sustain the jury's verdict in favor of Cherie and against Union, and correspondingly, whether the trial court erred in entering judgment n.o.v. for Union; and

(2) Whether the amount of the jury's verdict was inadequate.

The theory of Cherie's case against Union is that due to Union's (i.e., the nurses') alleged failure to monitor Wanda's reaction to the Pitocin she developed abnormal contractions, and that these abnormal contractions eventually led to first a Bandl's ring and then the rupture of her uterus. Had proper monitoring been accomplished, argues Cherie, the abnormal contractions would have been identified, Johnson would have been informed, and proper and timely action could have been taken to normalize the contractions, either by reducing (or stopping) the Pitocin flow — which results in a very rapid return to normal labor — or by placing Wanda under a general anesthetic within a sufficient amount of time to counteract the continuing contraction. Union argues that there is a lack of evidence in the record that any failure on its part proximately resulted in Cherie's injuries.

To establish a prima facie case of negligence, that is, to present suffi-

cient evidence upon which the jury may return a verdict for the plaintiff, that party must introduce testimony or other evidence which shows: 1) a duty on the part of the defendant; 2) a failure to perform that duty; and 3) damages or injuries proximately resulting to that party as a result of such failure. *Clayton v. Penn Central Transportation Co.* (1978), 176 Ind.App. 544, 376 N.E.2d 524.

There is no dispute concerning the proposition that Cherie has significant injuries. There is also little dispute over the duty owed by Union to Cherie: Union admits in its motion to correct errors that the nurses were to monitor Wanda's contractions unless the doctor was present and *personally monitoring his patient.* Additionally, expert testimony established that the proper way of monitoring (i.e., the standard of care) in Terre Haute in 1968 was to have a nurse or other knowledgeable person sit by the patient's bed and place her hand on the patient's stomach to determine the strength and duration of the contractions. An additional factor tending to show negligence on the part of Union was that Wanda was known to be a "high risk" patient (insofar as childbirth was concerned) for at least three reasons: 1) she was 43 years old; 2) she had delivered twelve other children; and 3) prior to the development of abnormal contractions, meconium staining appeared in the amniotic fluid. Thus the duty owed Cherie under the circumstances was clear.

We believe there is sufficient evidence for the jury to have concluded that this duty was breached. Wanda testified that no one performed this continuous monitoring; the nurses' testimony confirmed that no continuous monitoring with hand-on-abdomen was done. Since Johnson evidently did very little, if any, monitoring in the manner required by the experts' testimony, this duty then fell to Union. There is sufficient evidence to establish a breach of that duty.

Union also contends that there is no evidence of proximate cause; specifically, that there is no evidence that the failure of the nurses to monitor in a certain way resulted in injury to Cherie. However, it is clear that Union's argument in this regard is that under the circumstances the nurses and doctor never had enough forewarning that an abnormal condition was developing in order to be able to avoid the result. This argument, in effect, only begs the question, for it is precisely the converse of Cherie's: that there was never enough forewarning

because the nurses failed to monitor properly (continuously and in the proper manner), and that there could never be sufficient warning unless such monitoring were performed. We believe the jury was justified in finding Union's action to be a proximate cause of Cherie's injuries, especially in view of other testimony which established that the effects of abnormal contractions could be reversed very quickly by first recognizing the contractions and then either modifying the Pitocin flow or administering a general anesthetic.

As was stated in *Meadowlark Farms v. Warken* (1978), 176 Ind.App. 437, 376 N.E.2d 122 at 129:

"At times, many causes will influence a result, but as a matter of public policy, courts limit liability for negligent acts to the conduct which proximately caused the injury. Factual causation becomes proximate causation under the test of foreseeability. *Swanson v. Slagal* (1937), 212 Ind. 394, 8 N.E.2d 993; *see, State v. Dwenger* (1976), 168 Ind.App. 90, 341 N.E.2d 776; *Galbreath v. Engineering Construction Corp.* (1971), 149 Ind.App. 347, 273 N.E.2d 121; *Allison v. Huber, Hunt & Nichols, Inc.* (1977), 173 Ind.App. 41, 362 N.E.2d 193.

'One's negligence may furnish a mere condition for the incidence of another's negligence and allow the original actor to escape liability. *Schroer v. Funk & Sons, Inc.* (1968), 142 Ind.App. 223, 233 N.E.2d 680; *Slinkard v. Babb* (1953), 125 Ind.App. 76, 112 N.E.2d 876. If true, such negligence was not the active or efficient cause of the resulting injury. *However, the ultimate test of legal proximate causation is the reasonable foreseeability.* The assertion of an intervening, superseding cause fails to alter the test. *City of Indianapolis v. Falvey* (1973), [156] Ind.App. [366], 296 N.E.2d 896. For this Court to affirm a positive finding of proximate causation, we need only conclude that the evidence presented supports a reasonable conclusion that the original wrong was one of the proximate rather than remote causes. *Swanson v. Slagal* (1937), 212 Ind. 394, 8 N.E.2d 993; *Evansville & Ohio Valley Ry. Co. v. Woosely* (1950), 120 Ind. App. 570, 93 N.E.2d 355.' *Dreibelbis v. Bennett* (1974), [162] Ind.App. [414], 319 N.E.2d 634, 638. . . .

It is not necessary that the defendant's negligence be the sole

proximate cause. *Krohn v. Shidler* (1966), 140 Ind.App. 175, 221 N.E.2d 817; *Stauffer v. Ely* (1971), 149 Ind.App. 93, 270 N.E.2d 889; *Dreibelbis, supra.* Where two causes proximately cause an injury, one of which is attributable to negligence while the other is not, a party will be liable to the extent of his negligent act, in the absence of a finding of negligence on the part of the injured party. *Krohn, supra; Board of Commissioners v. Sisson* (1891), 2 Ind. App. 311, 28 N.E. 374; 21 I.L.E. Negligence § 66 (Supp. 1977)." (Emphasis by the court in *Meadowlark.*)

Accordingly, in applying the foreseeability test noted above, we hold that there was sufficient evidence of proximate cause to support the jury's verdict.

Therefore, we hold that the trial court erred in granting judgment n.o.v. to Union. In doing so, we find *Huff v. Travelers Indemnity Company* (1977), 266 Ind. 414, 363 N.E.2d 985, to be controlling:

"When the trial court is considering a motion for judgment on the evidence subsequent to the jury's verdict, it must view only the evidence favorable to the non-moving party and the reasonable inferences to be drawn from that evidence. The trial court may enter judgment only *if there is no substantial evidence or reasonable inference to be adduced therefrom to support an essential element of the claim,* i.e., the evidence must point unerringly to a conclusion not reached by the jury. *McCague v. New York, Chicago & St. Louis R.R.* (1946), 225 Ind. 83, 71 N.E.2d 569, 73 N.E.2d 48. This is the same standard which applies to a motion for judgment made at the conclusion of the evidence, i.e., there must be a complete failure of proof.

'It is only where there is a total absence of evidence or legitimate inferences in favor of plaintiff upon the issues, or where the evidence is without conflict and is susceptible of but one inference and that inference in favor of the defendant . . . .'

*Hendrix v. Harbelis* (1967), 248 Ind. 619, 230 N.E.2d 315; *accord, Vernon Fire & Cas. Ins. Co. v. Sharp* (1976), [264] Ind. [599], 349 N.E.2d 173; *Miller v. Griesel* (1974), 261 Ind. 604, 308 N.E.2d 701.

If there is relevant evidence which supports the verdict, then the motion may not properly be granted because evidence which sup-

ports the verdict is sufficient evidence, and the final determination is left to the fact finder. . . . The trial court may not weigh the evidence when considering whether to enter judgment contrary to the verdict. If the trial court is convinced that the weight of the conflicting evidence preponderates against the jury's verdict, he should order a new trial. . . . Our review of the trial court's entering judgment notwithstanding the verdict is whether there was evidence of probative value to support each essential element of the plaintiff's claim. If the evidence was conflicting, but there was relevant evidence to support the claim, then judgment was improperly granted in favor of the defendant." (Original emphasis.)

*Huff, supra,* at 990.

We believe the trial court has applied an erroneous standard in the case at bar in its decision to enter judgment n.o.v. For example, we quote from that court's judgment.

"Plaintiff's theory of proximate cause with respect to the Hospital was that Pitocin caused the uterus to rupture, and had the nurses monitored its effect on Plaintiff's mother, the rupture could have been prevented because purported abnormal contractions could have thereby been discovered and Dr. Johnson advised in time to have discontinued the drug. Such theory is not supported by the evidence.

By the great weight of the credible evidence, Pitocin was not running in the delivery room at any time, having been discontinued at 9 o'clock when Plaintiff's mother was moved from the labor room."

Elsewhere, the trial court's judgment states that there was no evidence of a breach of duty, nor was there any evidence of proximate cause. However, we find this position to be in conflict with the testimony, as discussed above.

It is obvious, then, that the trial court weighed evidence in its judgment n.o.v. Although this weighing of evidence is at times proper in determining whether to grant a new trial, such weighing and judging of credibility may not be done in granting judgment n.o.v.

"Our rules provide that, '[T]he court shall grant a new trial if

it determines that the verdict of a non-advisory jury is against the weight of the evidence . . .

\* \* \*

The trial judge in determining whether to grant a new trial sits as a 'thirteenth juror.' He should grant a new trial when, after sifting and weighing the conflicting evidence and the credibility of the witnesses, he believes that a contrary result should have been reached in the minds of reasonable men. *Bailey v. Kain* (1963), 135 Ind.App. 657, 192 N.E.2d 486. . . .

\* \* \*

### VI. *Conclusion*

The evidence was in conflict on each justiciable issue presented to the trial court on Travelers' motion for judgment on the evidence. It would appear that the trial court did, in effect, weigh the evidence concerning those issues on which he granted judgment for Travelers notwithstanding the verdict. This was improper and clearly erroneous, *as there was evidence of probative value to support the jury's verdict.* We cannot say that he should have done so, but the trial court could have granted to Travelers a new trial on these issues, as well as on the issue of due diligence, if he found that the weight of the conflicting evidence preponderated against the jury verdict on all issues." (Original emphasis.)

*Huff, supra*, at 994.

Accordingly, this cause must be reversed and remanded as to appellee Union, and judgment must be entered on the jury's verdict in favor of Cherie and against Union.

Finally, we must determine whether the amount of the verdict in favor of Cherie was inadequate in view of the evidence presented at trial. Cherie alleges that $350,000 was inadequate in view of testimony which established her economic losses alone at $800,000.

The rule is well-established in Indiana that before a judgment will be disturbed as awarding inadequate damages, the party recovering must show that the amount of the verdict is so small as to indicate passion, prejudice or impropriety. *Wickizer v. Medley* (1976), 169 Ind.App. 332, 348 N.E.2d 96.

On the facts presented by this case we cannot, as a matter of law, hold that a $350,000 verdict is inadequate. The jury was entitled to believe some of plaintiff's witnesses while disbelieving others; it could also accept some of one witness's testimony while rejecting other testimony from that same witness. The amount of the verdict need not reflect mathematical certainty in its computation or underlying proof. *Friendship Farms Camps, Inc. v. Parson* (1977), 172 Ind.App. 73, 359 N.E.2d 280.

The judgment of the trial court in favor of Johnson and against Cherie is affirmed; the judgment n.o.v. in favor of Union and against Cherie is reversed, and this cause is remanded with instructions to enter judgment on the jury's verdict in favor of Cherie and against Union.

Affirmed in part; reversed and remanded in part with instructions.

Robertson and Lowdermilk, JJ., concur.

NOTE—Reported at 381 N.E.2d 93.