**SANBORN ELECTRIC COMPANY, Appellant (Defendant and Counterclaimant),**

v.

**BLOOMINGTON ATHLETIC CLUB, and the City of Bloomington, Appellees (Plaintiffs and Counterdefendants).**

No. 1–981A268.

Court of Appeals of Indiana.

March 31, 1982.

Gene E. Wilkins, Rex E. Bennett, Bamberger & Feibleman, Indianapolis, Frank A. Barnhardt, Baker, Barnhardt & Andrews, Bloomington, for appellant (defendant and counterclaimant).

Andrew C. Mallor, Mallor & Mills, P. C., Bloomington, for appellees (plaintiffs and counterdefendants).

RATLIFF, Presiding Judge.

## STATEMENT OF THE CASE

Defendant-appellant Sanborn Electric Company (Sanborn) brings this appeal from the judgment by Monroe Superior Court II in favor of plaintiff-appellee Bloomington Athletic Club (BAC) and appellee City of Bloomington (the city) in BAC's suit for damages for breach of a construction contract. We affirm.

## FACTS

In 1978 Sanborn and BAC entered into a contract for the construction of eight racquetball courts at BAC's facility. The agreement included a warranty for material and labor which limited Sanborn's liability to correcting defective conditions covered by the warranty. The warranty expressly provided that the wall and ceiling panels would not dent or spall from racquet hits and that the exposed wall and ceiling panel joints would be chemically bonded and sanded. The particle board panels were covered with a two-part epoxy finish. The contract price for the construction of the courts was $126,250.

Bloomington Athletic Club opened its courts for play in November 1978. Shortly thereafter the epoxy finish on the wall and ceiling panels began to spall at the seams, chip, and delaminate. In January 1979 Sanborn sent a representative to BAC to repair the damaged areas, but this repair work did not prevent further failure of the panel surfaces. Representatives of Sanborn and BAC conferred about the problem, and, on March 30, 1979, pursuant to BAC's request, Sanborn submitted a repair proposal. Bloomington Athletic Club rejected the proposal as just another proposal to patch the damaged areas, and, on May 2, 1979, BAC filed an action for breach of contract. Sanborn answered and counterclaimed for $38,-502.96, with interest, which was the balance due on the contract. Sanborn also sought foreclosure of its mechanic's lien which it had filed against the property. The city was also named a counterdefendant because it was the owner of part of the real estate

underlying BAC's facility at the time the notice of intention to hold the mechanic's lien was filed. After a bench trial, the court entered judgment in favor of BAC on its claim and against Sanborn on its counterclaim. The trial court found BAC's damages, based on the cost of repairing the defects, to be $96,000, against which it set off the unpaid balance of the contract, for a net award of $57,497.04.

## ISSUES

Sanborn frames the issues in this appeal as follows:

"1. Whether the Trial Court has erred in finding that the Sanborn Electric Company's (Sanborn) court system cannot be repaired consistent with the proper performance standards.

"2. Whether the Trial Court erred in finding that Sanborn's repair proposal would not produce compliance with the Sanborn warranties.

"3. Whether the Trial Court erred in finding that the evidence revealed no method to adequately repair the Sanborn court system.

"4. Whether the Trial Court erred in concluding that Sanborn was given a reasonable opportunity to repair the court system and that the limitation of remedies failed of its essential purpose.

"5. Whether the Trial Court erred in finding that the cost of repair of the defects in the court system is $96,000.

"6. Whether the Trial Court erred in its conclusion that Bloomington Athletic Club's (BAC) damages are to be measured by the cost of remedial work rather than the difference of value between the facility as actually constructed and as it should have been constructed pursuant to the contract.

"7. Whether the Trial Court erred in its conclusion that Sanborn's mechanic's lien is extinguished."

Appellant's Brief at 1.

## DISCUSSION AND DECISION

### Issue One

Bloomington Athletic Club argues that Sanborn's first issue, whether the trial court erred in finding that Sanborn's court system cannot be repaired consistent with the proper performance standards, has been waived for failure to raise it in the motion to correct errors. We disagree because Sanborn's first assignment of error in its motion adequately raises this question.

Bloomington Athletic Club also maintains that Sanborn's first issue is based on a mischaracterization of Finding No. 16, which reads as follows:

"(16) That Defendant's repair proposal will not produce compliance with the sample and the warranties, that the defects constitute a failure of the court system as a whole and the evidence reveals no method of repair which will comply with the sample and warranties, other than by replacement of the existing court system with a different court system;
. . . . ."

Record at 129.

■ We agree with BAC that the trial court's finding that Sanborn's "repair proposal will not produce compliance with the sample and warranties" is not the same as saying that Sanborn's "court system cannot be repaired consistent with the proper performance standards." The latter statement is much broader and is not limited to Sanborn's proposed method of repair. No other finding by the trial court indicates the court determined that the racquetball court system could not be repaired consistently with the proper performance standards. Accordingly, Issue One presents nothing for us to review.

### Issues Two and Three

■ Sanborn, apparently referring to Finding No. 16, asserts that the trial court erred in finding that Sanborn's repair proposal would not produce compliance with the warranties. Bloomington Athletic Club urges us to find a waiver of this issue, as well, on the ground that Sanborn failed to argue this issue in its brief and failed to specify in what respect the trial court's finding is erroneous. Although Sanborn

has devoted but one page to its discussion of Issues Two and Three, we find that Sanborn has sufficiently argued this question under its discussion of Issue One to permit us to address the matter on its merits.

■ Sanborn also asserts that the trial court erred by stating in Finding No. 13 that no methods of repair, other than that recommended on March 30, 1979, have been proposed by Sanborn. Sanborn maintains that this finding indicates the trial court ignored Sanborn's subsequent repair proposal of October 19, 1979, which was transmitted to BAC's attorneys on October 24, 1979. However, we find no reference to any such error in Sanborn's motion to correct errors, and the matter is, therefore, waived. *Hockelberg v. Farm Bureau Insurance Co.*, (1980) Ind.App., 407 N.E.2d 1160; *Indiana Motorcycle Association v. Hudson*, (1980) Ind.App., 399 N.E.2d 775; Ind.Rules of Procedure, Appellate Rule 8.3(A)(7).

■ Sanborn further contends, in regard to Issues Two and Three, that the trial court based its decision upon another erroneous finding, No. 11. Finding No. 11 states that the March 30, 1979, proposal for repairs did not include repair of the racquetball court ceilings. Our inspection of the proposal reveals no mention of the ceilings, although the walls are specifically mentioned numerous times. Furthermore, Thomas Johnson, Vice-President of Sanborn, testified on cross-examination that the repairs proposed in his March 30, 1979, letter would not have included repair of the ceilings. This court will set aside the finding of a trial court only when it is clearly erroneous. Ind. Rules of Procedure, Trial Rule 52(A). We cannot say that Finding No. 11 is clearly erroneous.

■ Sanborn cites various items of evidence which tend to show that BAC's proposal, if put into effect, could repair the damaged areas. However, we cannot weigh the evidence or judge the credibility of witnesses but shall consider only that evidence and the reasonable inferences from the evidence which support the judgment. *Sigsbee v. Swathwood*, (1981) Ind. App., 419 N.E.2d 789; *Uebelhack Equipment, Inc. v. Garrett Bros.*, (1980) Ind.App., 408 N.E.2d 136.

Near the top of the warranty, or "guarantee" as it terms itself, is the statement, "A Seamless High Performance Epoxy Court System For Racquetball Handball Squash Courts." The warranty states, with regard to the hardness of the wall panels, "Panels shall not dent or spall from racquet hits: 62 # /c.f. density," and with regard to the hardness of the ceiling panels, "Panels shall be of same quality as wall panels." With regard to the wall panel joints, the warranty says, "Exposed joints shall be chemically bonded and sanded smooth," and of the ceiling panel joints, it says, "Exposed joints shall be chemically bonded and sanded." The limitation of liability clause provides as follows: "Liability of the Sanborn Electric Company under this guarantee is limited to correcting any defective conditions covered by this guarantee and does not cover any other form of liability." Record at 410.

There was evidence of considerable chipping, spalling around the seams, and delamination of the walls and ceiling of the eight racquetball courts. In January 1979, an employee of Sanborn was sent to BAC to patch the damaged spots. This did not satisfy BAC, because, as BAC President William Sample testified, the club was guaranteed racquetball courts which would look like a model of the structure and surface of a court wall which was shown to Sample during the negotiation of the contract. Kenneth Tator, a paint consultant and BAC's expert witness, identified three kinds of failure of the surface of the court walls and ceilings: (1) Failure due to disbonding of the coating at the seams, (2) failure at the seams due to movement, and (3) failure caused by impact. He further testified that spot repairs would not prevent the problem from recurring because other areas of the coating unaffected by the repairs would be subject potentially to the same failure. When asked for his opinion on whether the March 30, 1979, repair proposal by Sanborn would take care of the

problems in the court system, Tator stated that the proposal was for spot repairs and that he did not think a spot repair proposal would remedy the failures. He felt it would be very difficult and expensive to remove and replace the coating system. The cheapest way to solve the problem would be to remove and replace the wall and ceiling panels.

■ There was evidence to support the determination that Sanborn's repair proposal would not result in compliance with the sample and warranties and that there is no method of repairs, other than replacement with a different system, which would comply with the sample and warranties. The trial court's Finding No. 16 is not clearly erroneous.

### Issue Four

Sanborn maintains that the trial court erred in determining in Finding No. 17 that Sanborn "has been given a reasonable opportunity to place the courts in the condition promised," Record at 129, and in Conclusion No. 5 that Sanborn's "limitation of remedies under the contract failed of its essential purpose," Record at 130.

■ As we have already seen, an employee of Sanborn was sent in January 1979 to BAC to patch the damaged areas. This method of repair did not prevent further failure of the court surfaces, however. On March 30, 1979, pursuant to BAC's request, Sanborn submitted a proposal for remedying the problem. As we determined under Issue Two, however, the trial court properly found that the repair proposal would not produce compliance with the warranties and sample.

Sanborn complains, nevertheless, that William Sample of BAC sat "as judge and jury determining that any repairs would be inadequate," Appellant's Brief at 34, and that the evidence showed that the court system clearly could be repaired. Sanborn further argues that the validity of the limitation of liability is not affected by whether Sanborn submitted a proposal or by what BAC's evaluation of the proposal is.

We have stated earlier in this opinion that we shall not weigh the evidence. We acknowledge that there was evidence, even from Kenneth Tator, BAC's expert witness, tending to show that the repairs Sanborn had performed and proposed to perform might very well remedy the problem in particular areas repaired. However, there was also evidence that these repairs would not prevent other, previously undamaged and unrepaired areas from chipping, spalling, or delaminating. The crucial issue is not whether William Sample was sitting as "judge and jury" in demanding and then rejecting Sanborn's repair proposal. The issue is, rather, whether there was probative evidence from which the trial court could have determined that Sanborn had a reasonable opportunity to comply with its warranties once it was notified of the defects and failed to do so and that, consequently, Sanborn can be held liable for damages despite the agreement of the parties that the remedy for defective conditions was to be correction of those conditions by Sanborn. We hold that the evidence does support those determinations. Bloomington Athletic Club was entitled to have the defective condition *corrected*. The trial court reasonably could have concluded that Sanborn's proposal would have resulted in a trip by Sanborn employees to BAC each time a few more chips appeared in the walls or ceilings of the racquetball courts and that such a continuous process of repair would not give BAC that for which it had bargained. Sanborn was given an opportunity to correct the defective condition and then to propose a long-term solution to the problem. The trial court reasonably concluded that the limitation of liability clause had not resulted in a correction of the defective condition by Sanborn and that, accordingly, a damage award to BAC, which could then have the defective condition corrected by someone else, was the appropriate alternative.

Finding No. 17 and Conclusion No. 5 are not clearly erroneous.

### Issue Five

The next error alleged by Sanborn is the trial court's determination in Finding No.

28 that the cost of repairing the defects is $96,000. Sanborn argues that the finding was based on William Sample's testimony that he had received an estimate from another firm that the cost of *replacement* of the Sanborn court system with another system would be $10,000 to $12,000 per court. The only evidence of the cost of *repair*, according to Sanborn, is the $5,075 figure quoted in Sanborn's repair proposal. Sanborn also maintains that Finding No. 16 conflicts with Finding No. 21, in that the former states that "the evidence reveals no method of repair which will comply with the sample and warranties, other than by replacement of the existing court system with a different court system," Record at 129, whereas the latter provides that "the damages occasioned Plaintiff by Defendant's breach are non-permanent and reparable damages to property attached to real estate having a value separate from the real estate," Record at 130.

As BAC points out, however, Sample used the terms "repair" and "replace" interchangeably. Kenneth Tator recommended that the existing wall and ceiling panels be removed and replaced rather than attempting to remove the layered epoxy coating, which would be extremely expensive and difficult. Phil Trotter, Jr., who is President of Terstep Recreation Company, a racquetball court contractor, recommended that new panels be installed directly over the existing system at a cost of $125,000. When cross-examined as to whether he was talking about replacement of the entire system rather than repairing the existing system, Trotter responded, "That's correct. No demolition, actually a resurfacing with another panel." Record at 337. The contract between Sanborn and BAC provided that, in addition to installing the wall and ceiling panels and the epoxy coating, Sanborn would furnish and install steel studs, doors and door frames, wooden floors, and, in two of the courts, glass rear walls and doors. The evidence most favorable to the findings and judgment tends to show that not all of the items installed by Sanborn would have to be replaced in order to correct the defects.

Findings No. 18 and 19 indicate that the trial court used terms such as "courts" and "court system" in a narrow sense:

"(18) That the 'courts' as herein referenced are constituted of the panels and coating comprising the interior walls (front, back and sides) and ceiling of the compartments in which the game of racquetball is played at Plaintiff's facility;

"(19) That no deficiency is presented by the evidence as to the steel studs, floors, lights and doors installed by Defendant under its contract with Plaintiff;
. . . ."

Record at 129.

■ It is common knowledge that the repair of such items as a damaged automobile body or a malfunctioning kitchen appliance often involves the replacement of some of the parts. Although the trial court indicated in Finding No. 16 that the only method of repair which would comply with the sample and warranties is the replacement of Sanborn's court system with another, it is apparent from the evidence, findings, and context that the court did not contemplate or intend to suggest that the work would entail the redoing of all of Sanborn's work or the substitution of new components for all of those furnished and installed by Sanborn. Consequently, we perceive no conflict between Findings No. 16 and 21.

■ The trial court reasonably treated the cost estimates of BAC's witnesses as evidence of the cost of repairing the racquetball facilities which Sanborn had constructed. We have already determined that there was sufficient evidence to support the court's conclusion that the only way to comply with the warranties would be to replace the existing court system, meaning the panels and coating comprising the interior walls of the racquetball courts. Thus, the trial court was not constrained to adopt Sanborn's $5,075 figure as the cost of repair. Bloomington Athletic Club's evidence of the cost of repair ranged from $80,000 (8 courts at $10,000 per court) or $96,000 (8 courts at $12,000 per court) to $125,000.

The trial court's Finding No. 28 that the cost of repair of the defects is $96,000 is well within the scope of the evidence and is not clearly erroneous.

*Issue Six*

Sanborn asserts that the trial court erred in Conclusion No. 7 by stating that the "measure of damages is the cost of placing the courts in the condition warranted by" Sanborn, Record at 130–31, rather than the difference between the value of the facility as it was actually constructed and the value of the facility as it should have been constructed pursuant to the contract. Sanborn contends, in essence, that the replacement of the racquetball court system would require that a substantial amount of good quality work be undone and that, therefore, the difference in value measure should have been applied.

 The rule in Indiana regarding damages for breach by a builder of a construction contract is that,

"[w]here the owner, believing that a building has been completed in accordance with his contract, pays in full the contract price, and takes possession, but thereafter finds that there has been such a breach of the contract that in order to make the work conform to the contract requirements, a substantial part of what has been done must be undone, the measure of damages in an action by the owner is the difference between the value of the building as constructed and what its value would have been had it been constructed in accordance with the contract."

*Morris v. Fox*, (1922) 79 Ind.App. 389, 393, 135 N.E. 663, *trans. denied.* However, where the defects are "of such a character that they might easily be remedied without taking down and reconstructing any substantial portion of the building," *id.* at 394, "the measure of damages is the reasonable cost of altering the defective parts . . . so as to make them conform to the plans and specifications," *Springer v. Jones*, (1919) 76 Ind.App. 269, 270, 123 N.E. 816, *trans. denied.*

Although Sanborn urges us to find that the difference in value measure should have been applied here, it has not cited us to any evidence in the record from which the trial court could have computed damages in that fashion. Instead, Sanborn maintains that, if BAC wanted to recover compensatory damages, it should have introduced valuation evidence.

 The question of the burden of proving the difference in value of the property in breach of construction contract actions, such as the one before us, has not been decided by an appellate court in Indiana. However, in *General Outdoor Advertising Co. v. LaSalle Realty Corp.*, (1966) 141 Ind. App. 247, 218 N.E.2d 141, *trans. denied*, Justice Hunter (then Judge Hunter of the Appellate Court) considered this question in the context of tortious injury to a building. The plaintiff owner introduced evidence of the cost of restoring the building and of the original cost of the building, but there was no evidence of the value of the building before the injury. The rule regarding damages for tortious injury to property attached to real estate, such as a building, is somewhat different from that in the case of a breach of a construction contract. In the case of tortious injury, where the injury is permanent, that is, where the cost of restoration exceeds the value of the building before the injury, the measure of damages is the value of the property before the injury. On the other hand, where the injury is non-permanent, the measure of damages is the cost of restoration. *Id.*

With regard to the burden of proving the value of the property before the injury, Justice Hunter said:

"It must be assumed that when the appellee [plaintiff owner] submitted repair costs, it considered the building to be repairable and not permanently damaged. There is testimony to this effect in the record. Indeed *it would seem strange to require a party to carry the burden of proof as to a fact which might be adverse to his cause.* Consequently, if the appellant was of the opinion that the building was permanently damaged, the burden

was on it to demonstrate such and failing to do so, the appellant has waived this question. At this stage in the proceedings, the appellant cannot ask that the case be returned to the lower court merely to determine the market value of the building before the injury. Therefore, we hold that the appellee has carried his burden of proof by showing the restoration costs. *If the appellant desired to take advantage of a more beneficial measure of damages to the effect that the building was permanently damaged, it was incumbent on the appellant to demonstrate the same by evidence of probative value.*" (Our insertion and emphasis.)

*Id.* at 269–70.

In breach of construction contract cases, the factor that determines which of the alternative measures of damages applies is whether the defects may be remedied without taking down and reconstructing a substantial part of the building, *Morris v. Fox, supra,* or whether the defects could be repaired at a reasonable cost, *James I. Barnes Construction Co. v. Washington Township,* (1962) 134 Ind.App. 461, 184 N.E.2d 763, *trans. den.,*[1] or, as it is often stated, whether construction and completion in accordance with the contract would involve unreasonable economic waste, Restatement of Contracts § 346(1)(a) (1932). In 5 Corbin on Contracts § 1089, at 491–92 (1964), we find support for the notion that the breaching builder, or contractor, like the tort-

feasor in cases such as *General Outdoor Advertising,* should carry the burden regarding unreasonable economic waste:

"This treatise supports the rule that the damages should be measured in the same way whether the breach be large or small; it should be determined by the cost of completion (the cost of curing the defects) except in a case in which actual completion (the actual curing of the defects) would cause unreasonable economic waste. In the latter case the damages should be the difference between the value of full performance as promised and the value of the defective performance actually rendered. Any reasonable doubt as to whether curing defects would cause such economic waste should be resolved against the contractor guilty of the breach; and on him should be put the burden of proof if there is dispute on the issue."

*Accord, County of Maricopa v. Walsh & Oberg Architects, Inc.,* (1972) 16 Ariz.App. 439, 494 P.2d 44.

Earlier in this opinion we upheld Finding No. 21, which states that the damages caused by Sanborn's breach are non-permanent[2] and reparable. Sanborn does not challenge Finding No. 19, which states that the steel studs, floors, lights, and doors of the racquetball courts were not shown to be deficient. Furthermore, we have upheld Finding No. 16, which states that Sanborn's repair proposal would not result in compliance with the sample and warranties and

---

**1.** We observe that in *James I. Barnes* the Appellate Court affirmed the judgment in a case which was tried on the theory that the defects could not be repaired at a reasonable cost and that the measure of damages was the difference between the value of the building as constructed and the contract price of the building. The contract price less value as constructed measure was expressly rejected in *Morris v. Fox,* (1922) 79 Ind.App. 389, 135 N.E. 663. The court there emphasized that only the difference between the value as constructed and the value the building would have had if it had been constructed in accordance with the contract would give the owner the full benefit of his contract where a substantial part of the work would have to be undone in order to repair the building. We note, however, in support of the ruling of the Appellate Court in *James I.*

*Barnes,* that it was the builder who appealed the judgment in favor of the owner, and the builder maintained that the damages were excessive. Under those circumstances, the Appellate Court was not called on to consider whether the damages awarded were improperly calculated so as to give the owner less than he was entitled to under *Morris v. Fox.*

**2.** The trial court apparently was influenced by the measure of damages in cases of tortious damage to property attached to realty. To the extent the court's findings, conclusions, and judgment comply with the law regarding breach of a construction contract by a builder, we deem such tort law terminology and references to be, at worst, surplusage.

that the only method of repair which will result in compliance is the replacement of the court system, meaning the interior walls and ceilings of the courts. Sanborn does not challenge the statement in Finding No. 16 that "the defects constitute a failure of the court system as a whole . . . ." Record at 129. Instead, Sanborn stands on its March 30, 1979, repair proposal, which we determined was reasonably rejected as inadequate by the trial court.

Moreover, Sanborn has not directed us to any evidence from which the trial court could have computed the difference between the value of the racquetball courts as constructed and the value which they would have had if they had been constructed in accordance with the contract. We believe that, in a case such as this where part but not all of the structure would have to be dismantled and replaced in the course of repairing the defective condition, a trial court needs to know whether the difference in value measure would result in a lower damage award than the cost of repair measure in order to determine whether the proposed repairs would result in unreasonable economic waste, and the builder should bear the burden of proving the difference in value. *Cf., General Outdoor Advertising v. LaSalle Realty*, (1966) 141 Ind.App. 247, 218 N.E.2d 141, *trans. denied*, (the defendant has the burden of showing that the building is permanently injured if he desires to take advantage of the market value measure of damages in a tort case). Clearly the trial court must know the difference in value in order to award damages on the basis of that measure. As Justice Hunter suggested in *General Outdoor Advertising*, it would not make sense to require an owner to prove the difference in value when what he wants are the financial resources to repair the defective condition in his building.

Accordingly, we hold that Sanborn failed to carry its burden of proving that repair of BAC's racquetball courts would result in unreasonable economic waste and what the appropriate amount of damages is. Conclusion No. 7, which, in effect, establishes the cost of repair as the measure of damages, is not clearly erroneous.

*Issue Seven*

Sanborn lists as an issue the matter whether the trial court erroneously concluded that the mechanic's lien is extinguished, but, as BAC observes, no argument on that matter can be found in Appellant's Brief, nor can we find any reference to either the mechanic's lien or BAC's observation in the Reply Brief. Indiana Rules of Procedure, Appellate Rule 8.3(A)(7) provides, in pertinent part, that "[e]ach error assigned in the motion to correct errors that appellant intends to raise on appeal shall be set forth specifically and *followed by the argument applicable thereto* . . . . Any error alleged in the motion to correct errors not treated as herein directed shall be deemed waived." (Our emphasis.) Sanborn's failure to argue this issue constitutes a waiver of the alleged error. *Jenkins v. State*, (1975) 263 Ind. 589, 335 N.E.2d 215; *Long v. Johnson*, (1978) Ind.App., 381 N.E.2d 93.

Judgment affirmed.

NEAL and ROBERTSON, JJ., concur.