603 P.2d 513

**FAIRWAY BUILDERS, INC., an Arizona Corporation, Appellant,**

v.

**MALOUF TOWERS RENTAL CO., INC., an Arizona Corporation, Appellee.**

No. 1 CA–CIV 3318.

Court of Appeals of Arizona,
Division 1,
Department B.

July 3, 1979.

Rehearing Denied Aug. 28, 1979.

Review Denied Sept. 25, 1979.

Law Offices of Frederick E. Kallof by Frederick E. Kallof, Sandra L. Massetto, Phoenix, for appellant.

Streich, Lang, Weeks & Cardon, P. A. by Dan M. Durrant, Robert E. Miles, Phoenix, for appellee.

OPINION

EUBANK, Judge.

The issues raised by the appeal and cross appeal in this complex case all involve an office building and garage constructed by appellant/cross appellee, Fairway Builders, Inc. (Fairway) for appellee/cross appellant, Malouf Towers Rental Co., Inc. (Malouf). The case was tried to the court without a jury, and no findings of fact or conclusions of law were requested or given. In this situation, we must affirm if possible "on any theory within the issues and supported by the evidence." *Gabitzch v. Cole,* 95 Ariz. 15, 18, 386 P.2d 23, 25 (1963); *Harmon v. Hanson's Pump & Machine Works, Inc.,* 4 Ariz.App. 107, 109, 417 P.2d 741, 743 (1966). Further, we must assume that the court found every fact necessary to support its judgment. *Estate of Brashear,* 54 Ariz. 430, 96 P.2d 747 (1939). All inferences supported by the evidence must be taken in favor of affirming the judgment. *Odom v. First National Bank of Arizona,* 85 Ariz. 238, 336 P.2d 141 (1959); *Logan v. O. S. Stapley Company,* 14 Ariz.App. 65, 480 P.2d 680 (1971).

In light of these standards, the essential facts of this case are as follows. Malouf, a corporation formed by three members of the Malouf family, obtained a 99-year ground lease on a parcel of property located on Central Avenue in Phoenix. On November 4, 1964, Malouf contracted with Fairway for Fairway to construct a high-rise office building on the site for $1,279,000.00. The basic contract was on a four-page form entitled "The Standard Form of Agreement Between Owner and Contractor," and was supplied by the American Institute of Architects. On page four of this Agreement, other documents are incorporated by reference into the contract. These other documents include the building plans and specifications, an "Agreement Dated November 4, 1964," and the "General Conditions." The General Conditions is another document supplied by the American Institute of Architects, the full title of which is "The General Conditions Of The Contract For The Construction Of Buildings."

The parties again contracted on April 20, 1965 for Fairway to build the garage which was to accompany the office building. The contract sum was $181,200 and the parties again utilized "The Standard Form Of Agreement Between Owner and Contractor." Like the office building contract, the garage contract incorporated the plans and specifications, and the General Conditions.

The two contracts were executed by W. B. Malouf, President of Malouf, and by Alfred Tibshraeny, President of Fairway. Mr. Tibshraeny and the Maloufs are related. Together, the two contracts constituted the Malouf Towers Project. While Fairway did some of the actual construction work itself, much of the work was performed by numerous subcontractors.

In 1968, Fairway brought this action against Malouf seeking recoveries for various alleged breaches of contract and on the basis of other theories. In its amended complaint, Fairway prayed for sums allegedly owed to it by Malouf under the office building and garage contracts. Further, it sought payment for extra work it had allegedly performed at Malouf's oral request and for fees paid out of money owing to it, and requested foreclosure of its mechanics' lien. Malouf counterclaimed and alleged that some of the construction work was negligently done and was defectively and incompletely performed in breach of contract. The case was exhaustively tried to the court over a period of weeks. As already noted, no findings of facts or conclusions of law were requested or given. The court's judgment of August 5, 1975 reflects its acceptance of most of the allegations in the complaint and counterclaim.

The court awarded Fairway substantial amounts as due under the contracts (offset by allowances for work not done), and large sums for extra work. However, the court also awarded Malouf a sizeable amount as compensation for defective and incomplete work. Many of the sums awarded to Fairway were, by the terms of the judgment, to bear prejudgment interest from various dates. In paragraph 11 of the judgment, the court offset the awards in favor of the parties, and the net result was a judgment in favor of Fairway of $90,188.76, "which money judgment shall bear interest at the rate of six (6%) percent per annum from and after dates due until paid as set forth herein." This provision has caused considerable confusion in view of the court's original decree that various amounts awarded to Fairway were to bear prejudgment interest from various dates. How is the prejudgment interest to be calculated in light of the offset? The court also awarded Fairway a mechanics' lien on the Malouf Towers Project property in the net amount after offsets, $90,188.76.

Both parties challenge the judgment on numerous bases, most of which involve the sufficiency of the evidence. Further facts will be stated as necessary in the discussions of the various issues.

## I. THE VAULT DOOR

As already noted, the trial court awarded a large sum to Fairway as due under the office building contract. This sum was immediately partially reduced by offsets for work not performed, in breach of contract. One of these offsets was $1,000.00 for Fairway's failure to install a vault door specified in the plans. Fairway raises numerous challenges to this offset, but we consider only the alleged failure of Malouf to prove its damages due to the lack of the door since this issue is dispositive.

At trial, Malouf attempted to prove its damages and the value of the door through the testimony of James F. Lindlan, an architect connected with the Malouf Towers Project. He stated that the vault door had an approximate value of $1,000.00 to $1,200.00. However, the court sustained an objection to this testimony, although it was not stricken from the record. Malouf attempts to avoid the fact that the objection was sustained by contending that it is the rule in Arizona that testimony which enters the record but is not stricken, even though an objection to its admissibility is sustained, nevertheless remains part of the record. Malouf cites *Greene v. Hereford,* 12 Ariz. 85, 95 P. 105 (1908) in support of its contention. The entire relevant portion of *Greene* consists of the following sentence:

> The fifteenth assignment of error is idle, for the reason that, although the court sustained the objection to the question, the witness nevertheless answered the question after the objection was sustained, and the answer was neither withdrawn nor stricken out on motion, but remains in the record.

*Id.* at 97, 95 P. at 108. While this sentence does seem to support Malouf's suggested rule, we think *Greene* is inapplicable since that case involved a jury trial. Of course, it is important in a jury trial to strike testimony to which an objection has been sustained, or to give a cautionary instruction. However, there is no general requirement in trials to the court to strike evidence to which an objection has been sustained. Once the objection is sustained in a non-jury trial, the evidence is excluded and must not be considered by the court. Consequently, Mr. Lindlan's testimony as to the value of the vault door could not be considered and cannot provide a basis for the award of damages for the door.

In its brief, Malouf concedes that, absent Mr. Landlan's testimony, no evidence was presented establishing the amount of Malouf's damages due to Fairway's failure to install the proper door. In this situation, we are forced to conclude that there was no evidence presented by which Malouf discharged its obligation to prove its damages. *See Graham v. Asbury,* 112 Ariz. 184, 540 P.2d 656 (1975); 25A C.J.S. *Damages* § 144, at 11–12 (1966). Thus, the offset of $1,000.00 for the vault door in paragraph 1 of the August 5, 1975

judgment is vacated, and appropriate complying modifications of paragraphs 1, 7 and 11 must be made.

## II. THE OFFICE BUILDING ROOF

The amount awarded to Fairway as due under the office building contract was also offset by $7,541.00 to compensate Malouf for Fairway's failure to install the proper roof on the office building as required by the office building contract. On appeal, Fairway alleges that there was insufficient evidence to support and justify this offset. We disagree.

Fairway's primary contention appears to be that the only evidence which supports the offset for its failure to install the roof is negative evidence, and that this evidence is insufficient to overcome the positive evidence it presented. Specifically, Fairway suggests that the testimony of James F. Lindlan, one of the architects connected with the Malouf Towers Project, that the roof described in the plans and specifications for the office building was never installed, was negative evidence. In contrast, Fairway asserts that the testimony of Leroy Malouf, one of the owners of Malouf, that the parties agreed that the specified roof need not be installed, is positive evidence. Fairway further asserts that the negative evidence (Mr. Landlan's testimony) is insufficient to overcome the positive evidence (Mr. Leroy Malouf's testimony) so that there is no evidence to support the offset for the failure to install the proper roof. Fairway cites the following passage from *Illinois Bankers' Life Association v. Theodore*, 44 Ariz. 160, 173, 34 P.2d 423, 428 (1934):

We held, in substance, that mere negative testimony, with no proper accompanying and explanatory reasons in support thereof, is of no value as against positive evidence that a certain fact existed.

■ We believe that Fairway has misconstrued the importance of the *Illinois Bankers' Life Association* case and the negative evidence doctrine. The mere fact that evidence is of a negative nature does not mean that it is not probative or that it will

not support a finding. One commentator has described the Arizona negative doctrine as follows:

The rule of relevancy with which we are concerned may be correctly stated as follows: mere testimony by a witness that he did not see or hear an event occur has, *in and of itself*, no probative force sufficient to prove that the event did not occur.

However, where such negative evidence is coupled with a sufficient predicate, consisting of additional testimony or circumstances, to show that the witness' position and attitude of attention was such that he would probably have heard or seen the occurrence of the event had it happened, then such negative testimony is relevant and will support a finding.

Udall, *Arizona Law of Evidence* § 112, at 210–11 (1960). (Footnotes omitted). In this case, there was ample evidence that Mr. Lindlan had a full opportunity to see whether or not the roof described in the plans and specifications was ever installed. Consequently, his testimony, albeit negative evidence, was admissible, probative, and sufficient to support a finding that the specified roof was not installed. *See Doubek v. Greco*, 7 Ariz.App. 102, 104, 436 P.2d 494, 496 (1968).

■ Because Mr. Lindlan's testimony supported a finding that the specified roof was not installed, we believe that there was sufficient evidence to justify the trial court's conclusion that Fairway breached the contract by failing to install the specified roof, entitling Malouf to the offset. The trial court was certainly not obligated to believe or accept Mr. Leroy Malouf's testimony in which he attempted to excuse the nonperformance on the basis of an alleged oral agreement between the parties omitting the roof requirement from the contract.

Fairway also alleges that Malouf introduced insufficient evidence of its damages attributable to Fairway's failure to install the specified roof on the office building to support the offset. We have thoroughly examined those portions of the record cited

by both parties on this point and conclude that sufficient evidence of damages was presented.

## III. THE GARAGE ROOF (CANOPY)

The trial court awarded Fairway $23,382.27 as due under the garage contract. This figure was arrived at by the court by taking the amount due under the garage contract of approximately $48,587.77 and allowing a $25,205.50 offset to compensate Malouf for Fairway's failure to install a temporary canopy roof over the garage.

Fairway asserts on appeal that there was insufficient evidence to justify the offset in favor of Malouf for the absent garage canopy. Once again Fairway relies upon the negative evidence doctrine. Mr. John K. Parsons, the engineer who designed the garage, testified that the canopy called for in the plans and specifications was never installed. Fairway considers this negative evidence and asserts that it is insufficient to overcome the positive evidence presented by Fairway. This positive evidence consisted of the testimony of Mr. Leroy Malouf and Mr. Alfred M. Tibshraeny that the canopy roof was not included in Fairway's bid or the garage contract even though it appears on the plans. Allegedly, the roof was excluded because Malouf planned to add additional floors to the garage at a later date. For the reasons stated in the preceding section, we believe that Mr. Parsons' testimony that no canopy was ever built is probative and would support a finding on that point since he had a full opportunity to observe whether or not the roof was ever installed.

Further, we believe that there is sufficient evidence to support the trial court's determination that Fairway's failure to install the roof constituted a breach of the contract as written. That contract required Fairway to build the garage in accordance with Mr. Parsons' drawings. On page S–1 of those drawings, the following entry appears:

CANOPY—

1.—*TEMPORARY* ROOF OVER AREAS B'TW'N LINES A&B, C&D AT *LEVEL*

*# 4* and B'TW'N LINES D&E, F&G AT *LEVEL # 3* SHALL BE OF LIGHT GAGE METAL . . .

(Emphasis added). The garage in fact was constructed up to the third and fourth levels in accordance with the plans. Those plans also included future fifth and sixth levels. Despite this fact, the quoted material clearly indicates that a canopy roof was to be put over the garage by Fairway as it reached the third and fourth levels. The canopy was to be temporary, of course, because of the plans for future floors, but this quoted language clearly indicates that the roof was required as a part of Fairway's contract. It is also true, however, that the drawings on Page S–5 indicate that the canopy roof was to be installed only after the future fifth and sixth levels of the garage were built. Thus, it is apparent that the plans incorporated by reference into the contract are ambiguous as to whether Fairway was required to install the canopy after it built the third and fourth levels. From its judgment awarding Malouf an offset for Fairway's failure to install the canopy roof it is apparent that the trial court interpreted the contract to require that Fairway install the roof over the third and fourth levels.

This Court is not bound by the trial court's interpretation of the written contract instruments, for the interpretation of written instruments is a question of law to be determined by this Court independently. *Polk v. Koerner*, 111 Ariz. 493, 495, 533 P.2d 660, 662 (1975); *State Farm Fire and Casualty Company v. Rossini*, 107 Ariz. 561, 564, 490 P.2d 567, 570 (1971); *T. D. Dennis Builder, Inc. v. Goff*, 101 Ariz. 211, 213, 418 P.2d 367, 369 (1966). The interpretation of the contract instruments is to be made, if possible, on the basis of the plain and unambiguous terms of the documents. 17A C.J.S. *Contracts* § 296(1) (1963). However, we believe that, as a matter of law, the garage contract instruments taken as a whole, including the drawings, are ambiguous on the point under discussion. *See Slater v. Westland*, 27 Ariz.App. 227, 231, 553 P.2d 1212, 1216 (1976), where we held that

the "initial determination of whether an agreement is ambiguous, and thus subject to interpretation through the use of parol evidence, is a question of law to be determined by the court." Once the contract and the instruments forming the contract are determined to be ambiguous on a specific point, it is necessary to resolve the ambiguity by considering matters outside the written contract. *Miller Cattle Co. v. Francis*, 35 Ariz. 535, 539, 281 P. 211, 212 (1929); 17A C.J.S. *Contracts* § 294 b, at 28–37 (1963). The surrounding circumstances at the time that the contract was made should be considered in ascertaining its meaning. *Polk v. Koerner*, 111 Ariz. 493, 495, 533 P.2d 660, 662 (1975); *Kreig v. Hammels*, 29 Ariz. 280, 283–4, 240 P. 1031, 1032 (1925). It is for the trier of fact to determine what the surrounding facts and circumstances are. *Kreig v. Hammels, supra*, 29 Ariz. at 284, 240 P. at 1032. Further, where "an ambiguity exists on the face of the document or the language admits of differing interpretations, parol evidence is admissible to clarify and explain the document." *Standage Ventures, Inc. v. State*, 114 Ariz. 480, 482, 562 P.2d 360, 362 (1977). Where there is a conflict in the evidence presented to resolve the ambiguity, it is for the trier of fact to resolve the conflict. *Miller Cattle Co. v. Francis, supra*, 35 Ariz. at 539, 281 P. at 212. We will affirm the resolution of the conflict by the trier of fact so long as it is reasonably supported by the evidence.

■ In this case, we believe that there is a conflict in the evidence presented to resolve the ambiguity and that the evidence amply supports the trial court's determination that the facially ambiguous contract required Fairway to install the canopy roof. One of the surrounding circumstances which the trial court was entitled to consider under the *Polk* and *Kreig* decisions is the fact that Malouf wanted to reserve the option of adding additional floors to the parking garage but also desired to immediately, but temporarily, roof and protect the otherwise uncovered areas at the top of the garage constructed by Fairway. The testimony of the garage designer, John K. Parsons, clearly indicates that these considerations did indeed exist. This parol evidence was clearly admissible under the *Standage Ventures, Inc.* case since an ambiguity existed on the face of the contract documents, and this evidence created a permissible inference that the ambiguous contract documents required Fairway to install the roof as part of the garage contract. Because the admissible evidence fairly allowed this inference, we find that the trial court's determination that Fairway breached the contract by failing to install the canopy roof was supported by reasonable evidence.[1] We therefore affirm the offset of approximately $25,205.50 allowed by the trial court against Fairway's award for amounts due under the garage contract.

## IV. OFFSETS AGAINST AMOUNTS AWARDED FOR EXTRAS

■ In paragraph 2 of its judgment, the trial court awarded Fairway various amounts for extra work it or its subcontractors had performed at Malouf's request. In subparagraph (a), the court awarded Fairway $30,423.25 for lath, plaster, drywall and paint work performed by a subcontractor, Bob Campbell. However, the court allowed an offset of $18,000.00 against this award to Fairway. Similarly, in subparagraph (b), the court awarded Fairway $18,907.35 for hardware, lumber and formica, less an offset of $13,600.00. On appeal, Fairway contends that there was no evidence to justify the described offsets. We disagree.

Exhibit 33 in evidence is sufficient evidence to support the allowance of the two offsets. The exhibit is a letter from Malouf to Fairway which states that its purpose "is to confirm our understanding on the following items concerning the new building." The letter provides in pertinent part:

---

1. Fairway asserts that the trial court was obligated to accept the uncontroverted testimony of Mr. Leroy Malouf and Mr. Alfred M. Tibshraeny that the contract did *not* include the canopy roof. While their testimony supports Fairway's position, it was not uncontroverted and the trial court was certainly not obligated to accept it. The court obviously doubted their credibility and the record certainly sustains the reasonableness of that doubt.

Furthermore, this is to confirm our understanding on the following terms, which also are on an allowance basis.

(a) $6,000.00 for finish lumber on the four (4) O'Malley floors, to be paid to them as per lease.

(b) $6,000.00 for the remaining five (5) floors.

(c) $18,000.00 miscellaneous finish, based on $2,000.00 per floor.

(d) $1,600.00 for miscellaneous signs, such as directional, exit, door lettering, etc.

It is readily apparent that—and the parties both agree—the trial court based its allowance of the $18,000.00 offset on item (c), while the $13,600.00 offset was based on items (a), (b), and (d). The letter clearly states that an understanding existed that these allowances would be made, and the letter is certainly evidence of an agreement which justified the trial court's allowance of the two offsets.

Fairway contends, however, that Exhibit 33 is not an agreement executed by Fairway so that it cannot be bound by it. Fairway misconstrues the importance of the letter for it is certainly evidence of a *prior oral agreement* and the offsets allowed by the court enforced this agreement.

Fairway also contends that the letter was not one of the "contract documents" related to the building contract since the letter was not executed in compliance with Article 2 of the General Conditions, which provides in part that the "Contract Documents shall be signed in duplicate by the Owner and Contractor." Since the letter is allegedly not one of the "contract documents," Fairway contends that it is not bound by it. There are two reasons why this reasoning is incorrect. First, it was not necessary that the letter be one of the "contract documents." As noted, Fairway's claims for payment for the extras arose out of alleged oral requests by Malouf that Fairway perform the extra work. None of the "contract documents" related to the building contract establishes the propriety of these claims, yet the claims were properly based on the separate oral contracts. Similarly, Malouf's offset claims

arose out of an oral understanding related to the extras that was evidenced by Exhibit 33, described above. It was not required that the offset claims be established by one or another of the "contract documents" related to the building since the offset claims, like Fairway's claims for payment for the extras, arose out of a separate oral contract.

Second, it is certainly possible that Exhibit 33 was one of the "contract documents" even though Fairway never signed it. It is noteworthy that the General Conditions, which contain the requirement that all "contract documents" be executed by the owner and contractor, was signed by neither party. Nevertheless, the General Conditions document was made a "contract document" by virtue of the incorporation by reference clause on page 4 of the Standard Form, which was signed by Malouf and Fairway. In effect, the signatures appearing on the Standard Form were sufficient to execute that document and all documents it incorporated by reference, including the General Conditions. The Standard Form also incorporated by reference an "Agreement Dated November 4, 1964." Exhibit 33 is dated November 4, 1964 and we believe that it was therefore incorporated into the Standard Form by the phrase set forth above. Fairway argues that the quoted phrase was intended to refer to the Standard Form since that document was dated November 4, 1964. This contention is incongruous, however, for it would mean that the Standard Form incorporates itself by reference, which would be a strange result. For the two reasons stated above, we believe that Fairway's reasoning is defective and that the evidence, especially Exhibit 33, reasonably supports the trial court's award of the two offsets in question.

## V. MARBLECRETE FAILURE

The trial court awarded Malouf $59,813.15 as compensation for the failure of marblecrete to adhere to the office building. The court also awarded Malouf $14,805.54 as consequential damages for the failure of the marblecrete to adhere. On appeal, Fairway contends that the evidence

was insufficient to justify these awards. We disagree.

Marblecrete is a decorative finish applied to the exterior of the office building by a Fairway subcontractor, Bob Campbell. Section 18–18(f) of the Specifications for the office building, which defined the contractor's obligations under the contract, provides instructions for applying the substances underneath the marblecrete. In part, the instructions state that before "applying the finish coat, the surface of the brown coat shall be dampened evenly to obtain uniform suction." The subcontractor, Bob Campbell, attempted to dampen evenly by applying a sealer manufactured by Deer-O Paints and Chemicals, Limited. Eventually hunks of the marblecrete fell off the office building's exterior walls.

In its counterclaim, Malouf claimed that Fairway, through its subcontractor, had breached the contract when the Deer-O sealer was applied to the exterior walls prior to the application of the marblecrete. Further, Malouf alleged that the marblecrete application process was negligently performed by Fairway, through its subcontractor. At trial, Malouf attempted to prove its allegations by means of the testimony of James Lindlan, an architect connected with the Malouf Towers Project, and others. Specifically, Malouf contended and Mr. Lindlan testified that the contract required that the brown coat be dampened only with water, since no chemicals or sealers were specified in the contract for use in the dampening process. Other witnesses testified that this was a feasible method for dampening underneath the marblecrete. On the basis of this and other testimony, the trial court made the awards described above, although it is unclear from the judgment whether it relied upon a breach of contract or negligence theory. On appeal, Malouf apparently has abandoned its tort negligence theory and attempts to justify the marblecrete awards only on a breach of contract theory. In any event, we will not consider the tort negligence theory because the awards in question are fully supported by a breach of contract analysis.

We have thoroughly examined the contract provisions relating to the method specified for applying the marblecrete and the substances underneath the marblecrete. This examination leads us to conclude that, as a matter of law, the contract's description of the method for dampening the brown coat is ambiguous. The contract as written, including the Specifications, does not determine whether the brown coat was to be dampened with water or some other substance. Consequently, we cannot determine from the written contract whether Fairway breached the contract when its subcontractor applied the Deer-O sealer to the brown coat. In this situation, the ambiguity must be resolved by considering matters outside the contract. *Miller Cattle Co. v. Francis, supra.* See the discussion of these legal principles in Section III above, entitled "The Garage Roof (Canopy)." Parol evidence may be considered. *Standage Ventures, Inc. v. State, supra,* and it is for the trier of fact to resolve any conflict in the evidence presented to resolve the ambiguity. *Miller Cattle Co. v. Francis, supra.*

The parties presented considerable evidence in an attempt to explain the contract provisions relating to the method for dampening the brown coat. We believe that this evidence was in conflict so that the trial court was entitled and obligated to resolve the conflict and the contractual ambiguity. It did so by apparently accepting Malouf's evidence that the contract required that the brown coat be dampened with water and that no sealer was allowed for this purpose. The evidence, particularly the testimony of Mr. Lindlan and Mr. Dennis Hopper, reasonably supports this determination. Consequently, the trial court did not commit reversible error when it apparently concluded that Fairway breached the contract when its subcontractor dampened the brown coat with a sealer instead of water only. We further believe there was sufficient evidence that the breach of contract caused the marblecrete failure to justify the trial court's awards of damages for this failure.

## VI. MEASURE OF DAMAGES FOR THE MARBLECRETE FAILURE

The trial court's damage award for the marblecrete failure was made, both parties agree, on the basis that the walls where the marblecrete was improperly installed would have to be torn down to the studs. In effect, the court apparently believes that it would be necessary to entirely remove the exterior walls to properly repair the damage, and its award compensates Malouf for this.

On appeal, Fairway asserts that this belief of the trial court was erroneous for two related reasons. First, Fairway alleges that the evidence is uncontroverted that the marblecrete failure could be repaired without entirely replacing the exterior walls. Secondly, Fairway claims that the marblecrete surface was strictly decorative, so that any slight differences in appearance between the original design and the result after repairing the walls without starting from scratch would be insignificant.

Because the trial court allegedly failed to recognize or consider these facts, Fairway contends that it erred when it awarded damages on the basis of a cost of repair theory. Citing *County of Maricopa v. Walsh & Oberg Architects, Inc.*, 16 Ariz. App. 439, 494 P.2d 44 (1972) and *Blecick v. School District No. 18 of Cochise County*, 2 Ariz.App. 115, 406 P.2d 750 (1965), Fairway alleges that the cost of repair will result in economic waste since there was no need to entirely remove the exterior walls. In this situation, Fairway contends, the proper measure of damages is the difference in value. Although Fairway's briefs do not articulate this contention, apparently Fairway believes that the trial court should have awarded Malouf the cost of repairing the walls without entirely removing the exterior walls, together with the slight difference in value between the building as designed and the building as it would exist after these limited repairs were finished.

We will briefly discuss the applicable legal doctrines. Generally, the measure of damages for a breach by a builder of a construction contract is the cost of repair. *County of Maricopa, supra,* 16 Ariz.App. at 441, 494 P.2d at 46; *Restatement of Contracts* § 346(1)(a)(i) (1932); Corbin, 5 *Corbin on Contracts* § 1089 (1964). However, where an award based on this measure of damages would result in "economic waste," which is a term of art, the proper measure of damages would be the difference in value between the building as designed and the building as constructed. This Court discussed the concept of economic waste in *County of Maricopa, supra,* 16 Ariz.App. at 441–2, 494 P.2d at 46–7, as follows:

The concept of "economic waste" as it relates to changing the general rule as to damages for breach of a construction contract has been succinctly captured by comment (b) to Restatement of Contracts, § 346(1) (1932):

"The purpose of money damages is to put the injured party in as good a condition as that in which full performance would have put him; but this does not mean that he is to be put in the same specific physical position . . .. There are numerous cases . . . in which the value of the finished product is much less than the cost of producing it after the breach has occurred. Sometimes defects in a completed structure cannot be physically remedied without tearing down and rebuilding, *at a cost that would be imprudent and unreasonable. The law does not require damages to be measured by a method requiring such economic waste.*" (Emphasis added.)

If economic waste is present, the effect is to award damages on the basis of the difference in value of the building had it been completed in accordance with the contract and the value of the building as erected, rather than on the basis of reasonable cost of completion to conform to the contract. Restatement of Contracts § 346(1) (1932).

It is clear from this discussion that economic waste exists only when the cost of repair measure of damages would result in *unreasonable* duplication of effort. Further, eco-

nomic waste is not present and the difference in value measure cannot be used unless the building would be substantially destroyed by completely remedying the defects. *Blecick, supra*, 2 Ariz.App. at 123, 406 P.2d at 758.

■ The builder contending that the cost of repair measure of damages would result in economic waste has the burden of affirmatively proving the contention. *County of Maricopa, supra*, 16 Ariz.App. at 442, 494 P.2d at 47. The trial court's choice of the measure of damages will be affirmed on appeal if there is reasonable evidence to support the choice. *Id.*

■ We believe that there is more than sufficient evidence to support a finding that Fairway did not meet its burden. It is clear and uncontroverted that removal of the exterior walls would not result in the sort of substantial destruction of the building envisioned by the *Blecick* Court. Further, Mr. Dennis Hopper, vice president of a lathing and plastering company, testified that it was uncertain whether the defective walls could be satisfactorily repaired unless the exterior walls were entirely removed. Finally, this office building is located on Phoenix' main street, so that it is entirely reasonable for Malouf to insist that it receive a building with the exterior appearance it contracted for. As Fairway concedes in its briefs, any repair of the walls performed without entirely removing the exterior walls would result in a different appearance than called for in the contract. In our view, each of these factors individually would support a finding that Fairway did not meet its burden of proof and, considering them together, there is ample evidence to support such a finding.

## VII. THE DATE WHEN THE COST OF REPAIRING THE MARBLECRETE IS MEASURED

The trial court's award to Malouf of $59,-813.15 for the cost of repairing the marblecrete was made, both parties concede, on the basis that the time of trial was the proper time to measure the cost of repair. Fairway contends on appeal that under the mitigation of damages doctrine Malouf was entitled to the cost of repair, if at all, measured only at the time of the breach of contract. In support of this contention, Fairway cites only *Gaylord Builders v. Richmond Metal Mfg. Corp.*, 186 Pa.Super. 101, 140 A.2d 358 (1958), where the court stated the following:

When a building contractor has neglected to perform his contract in every respect, it is the duty of the owner to mitigate the damages resulting from the unfinished work which the contractor failed to perform. *Taber v. Porter-Gildersleeve Co.*, 271 Pa. 245, 114 A. 773. The rule that one cannot recover damages from a defaulting party which could have been avoided by the exercise of reasonable effort is applicable to construction contracts.

\* \* \* \* \* \*

When plaintiff therefore, defaulted in the performance of its contract in the above respects it was the duty of the defendants to mitigate the damages as of the approximate time of the default by doing the work themselves or through others, *at labor and material costs then obtaining.* The defaulting contractor should be compelled only "to pay what it would reasonably cost [to do the work] at *the time of the breach* less contract price. \* \* \*" *Taber v. Porter-Gildersleeve Co.,* supra. [271 Pa. 245, 114 A. 773.] (Italics added.) "As a general rule, the damages upon breach of contract are to be measured as of the date of the breach": 15 Am.Jur., Damages, § 50. *Id.* at 104, 140 A.2d at 359–60.

We believe that the Pennsylvania court and Fairway reached the conclusion that breach of contract damages are measured as of the time of breach by confusing this issue with the mitigation of damages concept. These are separate issues, and we will consider them separately, beginning with the question of whether damages are measured as of breach or as of trial.

■ We begin by acknowledging that the general rule appears to be that the

rights of the parties with respect to a breach of contract are fixed at the time of breach and that damages are measured as of that time. 25 C.J.S. *Damages* § 74, at 850 (1966); 22 Am.Jur.2d *Damages* § 52 (1965); Hale, *Handbook On the Law of Damages* § 82 (2d ed. 1912). However, this is not a rigid rule which the trial court must apply in all situations. McCormick, *Handbook On the Law of Damages* § 48 (1935); 22 Am.Jur.2d *Damages* § 52 (1965). We have located no Arizona cases dealing with this issue.

■ We believe that the determination of the *proper time as of when to measure* damages is a matter within the sound discretion of the trial court. The circumstances of each case will differ so greatly that it is impossible to adopt a fair rule specifying a definite point in time as of when damages are measured in every case. *See* Jaeger, 11 *Williston's Treatise on the Law of Contracts* § 1363, at 344–45 (3d ed. 1968). Consequently, it is important that the trial court be able, in each case, to evaluate the specific circumstances and exercise its discretion in choosing the point in time at which damages are measured. *See Restatement of Contracts* § 329 (1933). We will affirm the choice so long as the specific circumstances indicate that the trial court did not abuse its discretion.

■ We believe that the circumstances of this case are such that the trial court did not abuse its discretion when it chose to measure the damages for the marblecrete failure as of the time of trial. Since Malouf's claim for damages was unliquidated, it was not entitled to prejudgment interest. Thus, had the damages been measured as of a time prior to trial, inflation would have reduced the value of the damages awarded and those damages would have been insufficient as of the time of trial to repair the damage in the manner envisioned by the court. This would be an unfair result. It would run counter to the rule cited in *Williston's Treatise, supra*, that the applicable damages are always the sum which will put the party in as good a position as if the contract had been fully performed. *See*

also, *Restatement of Contracts* § 346 (1933). Further, as Malouf discusses at length in its brief, it would have been difficult for the trial court to award damages as of the time of breach, because of the difficulty in determining when the breach occurred. In short, we believe that the circumstances of this case indicate that the trial court did not abuse its discretion by measuring damages as of the time of trial.

As noted above, Fairway is also apparently contending that the trial court erred by measuring damages as of the time of trial because Malouf allegedly failed to mitigate its damages. Specifically, Fairway alleges that Malouf had a duty to mitigate damages by repairing the marblecrete long before trial. Since Malouf did not do so, Fairway argues that Malouf cannot increase Fairway's liability for damages by having the trial court measure damages as of the time of trial. We disagree with Fairway's argument.

■ The Arizona Supreme Court has described the duty to mitigate in the following terms:

"'Stated in broad terms, however, the measure of damages is such sum as will compensate the person injured for the loss sustained, with the least burden to the wrongdoer consistent with the idea of fair compensation, and with the duty upon the person injured to exercise reasonable care to mitigate the injury, according to the opportunities that may fairly be or appear to be within his reach. . . .'" 17 C.J. 844, § 166.

*S. A. Gerrard Co., Inc. v. Fricker*, 42 Ariz. 503, 508, 27 P.2d 678, 680 (1933). *Accord, Coury Bros. Ranches, Inc. v. Ellsworth*, 103 Ariz. 515, 518, 446 P.2d 458, 461 (1968). The key requirement is that the injured party exercise *reasonable* care to mitigate damages. No extraordinary or risky actions are required unless it would be unreasonable to fail to take those actions. The party in breach has the burden of proving that mitigation was reasonably possible but not reasonably attempted. *Enco, Incorporated v. F. C. Russell Company*, 210 Or. 324, 311 P.2d 737 (1957); 25 C.J.S. *Damages* § 96

(1966). Further, whether the injured party violated his duty to mitigate damages is a question of fact for the trier of fact, when there is conflicting evidence on the question. *Crag Lumber Company v. Crofoot*, 144 Cal.App.2d 755, 301 P.2d 952 (1956); 35A C.J.S. *Damages* § 176(9) (1966).

■ We believe that, as a matter of law, Fairway has failed to present any evidence to discharge its affirmative obligation to prove that Malouf has not taken all reasonable steps to mitigate its damages. Fairway's only contention is that Malouf should have repaired the marblecrete when it first began to fall off the walls. However, it would clearly be unreasonable to impose that obligation on Malouf because the extent of the breach (requiring the entire removal of the marblecrete) was not ascertainable until two years after its installation and shortly before trial.

For the reasons stated above, we reject Fairway's contention that the trial court erred when it awarded damages for the marblecrete failure measured as of the date of trial, and affirm the award.

## VIII. CONSEQUENTIAL DAMAGES

■ The trial court awarded Malouf several sums of money as compensation for consequential damages it suffered as a result of the marblecrete failure. On appeal, Fairway challenges four of these awards.

A. $2,309.50 For Load Testing and $2,464.25 for Engineering Testing.

Fairway challenges these two awards on the ground that there was no evidence that Malouf ever incurred these expenses. We disagree and affirm.

Malouf attempted to prove that these expenses were incurred by it through the testimony of John Bromley, a bank trust officer. However, Mr. Bromley testified that he paid these expenses from trust accounts which held stock in Malouf. This stock had previously been owned by Malouf family members. Upon the death of these persons, the stock passed into the trusts under Mr. Bromley's control. He held no office in the corporation, was never ex-

pressly authorized by the corporation to incur expenses on its behalf, and at all times acted on behalf of the trusts, which were stockholders in Malouf.

Because Mr. Bromley had no official connection with Malouf, at trial Fairway objected to any testimony by him that he incurred the testing expenses in connection with the marblecrete failure. The basis of the objection was, essentially, that the testimony was irrelevant since Malouf could recover damages only for those expenses that Malouf or its authorized agents incurred as a result of the marblecrete failure, and Mr. Bromley allegedly was not an authorized agent of Malouf. Initially, the trial court sustained the objection on the ground that no proper foundation for the testimony had been established. However, after listening to counsel the court reversed itself and allowed the testimony subject to a final ruling subsequently.

We believe that Mr. Bromley's testimony supports a finding that Malouf incurred the testing expenses, so that the awards must be affirmed. This belief is based on our conclusion that there was evidence presented from which the trial court could have concluded that Mr. Bromley was an agent of Malouf.

■ One way an agency relationship can be created is ratification after the fact by the purported principal of the purported agent's acts. This ratification can occur when a purported principal brings a lawsuit to enforce a transaction negotiated by the purported agent. *Merchants & Manufacturers' Ass'n v. First National Bank*, 40 Ariz. 531, 537, 14 P.2d 717, 719 (1932); *Hallenbeck v. Regional Agricultural Credit Corp.*, 47 Ariz. 477, 481, 56 P.2d 1041, 1042–3 (1936); Mechem, *Outlines of The Law of Agency* § 238 (4th ed. 1952); Seavey, *Handbook of the Law of Agency* § 38D, at 72 (1964); *Restatement (Second) of Agency* § 97 (1958). Section 97 of the *Restatement (Second) of Agency*, succinctly states the concept:

§ 97. Bringing Suit or Basing Defense
as Affirmance

*There is affirmance if the purported principal*, with knowledge of the facts, in an action in which the third parson or the purported agent is an adverse party:

(a) *brings suit* to enforce promises which were part of the unauthorized transaction or *to secure interests which were the fruit of such transaction and to which he would be entitled only if the act had been authorized* ; or

(b) bases a defense upon the unauthorized transaction as though it were authorized; or

(c) continues to maintain such suit or base such defense.

(Emphasis added).

We believe that the trial court could easily have found, on the basis of the record and the evidence presented, that the doctrine described in the emphasized portion of section 97 applied to this case. More specifically, the trial court could have found that by bringing suit to collect from Fairway the amounts expended by Mr. Bromley for testing, Malouf affirmed and ratified the transactions whereby Mr. Bromley incurred those expenses and, after the fact, made those transactions authorized transactions on its behalf. The logical conclusion to be drawn from this analysis is that the testing expenses were expenses incurred by Malouf through its authorized agent. Since there is more than ample support in the evidence and record to support this legal analysis, we must affirm the awards to Malouf for load and engineering testing.

B. $1283.55 for Fascia Repair Performed by Gay Plastering & Drywall, and $1500.00 for Fascia Repair Performed by Bob Campbell.

Fairway challenges these two awards on the ground that Malouf failed to introduce sufficient evidence to justify the awards by the trial court. We have thoroughly examined Fairway's arguments on these issues and disagree that the evidence was insufficient to justify the awards. Mr. Gary Malouf's testimony that he paid $1,283.55 to Mr. Gay on behalf of Malouf for masonry repair fully supports the trial court's award to Malouf in that amount.

Further, Mr. Thomas Bukowski's testimony that Malouf incurred a debt to Bob Campbell of $1500.00 for masonry repairs of the fascia is sufficient evidence that Malouf was damaged in that amount. Since the awards in question were supported by reasonable evidence, they must be affirmed.

## IX. AWARD OF ATTORNEYS' FEES AND COSTS OF DAMAGES

Malouf, as landlord of the office building, had, prior to the entry of judgment in this action, been sued by a tenant in the building because of its failure to keep the marblecrete fascia from falling off the building. In the current action, the trial court awarded Malouf $3130.55 as compensation for the attorneys' fees and costs it incurred in defending the suit brought by the tenant. This award was based on the theory that these expenses were consequential damages caused by Fairway's breach of concrete relating to the application of the marblecrete. On appeal, Fairway asserts that there is no evidence to support the award, and that there is no legal basis for it. The evidentiary challenge may be quickly disposed of because the award is more than adequately supported by the testimony of Mr. Gary Malouf that Malouf paid $3017.00 for attorneys' fees and $113.55 for costs (a total of $3130.55) to defend the lawsuit brought by the tenant.

As noted, Fairway also contends that there is no legal basis for the award. As to the attorneys' fees portion of the award, Fairway contends that attorneys' fees cannot be recovered unless there is a statute or express agreement of the parties which authorizes recovery, citing *O. S. Stapley Company v. Rogers*, 25 Ariz. 308, 216 P.2d 1072 (1923) and *State v. Williams*, 12 Ariz.App. 498, 472 P.2d 109 (1970). Since Malouf offered no statute or contractual provision to support the award of attorneys' fees, Fairway contends that the award was erroneously entered. As to the award of costs, Fairway contends that the recovery of costs statute, A.R.S. § 12–341, does not authorize the recovery of costs from a stranger to the litigation in which the costs were incurred.

Thus, since Fairway was a stranger to the litigation between Malouf and its tenant, Fairway contends that there is no legal basis for making it liable for Malouf's costs incurred in defending the tenant's suit.

We reject Fairway's argument for the following reasons. First, the authority cited by Fairway does not support its position. *Stapley* and *Williams* deal only with the situation where one party to a suit is attempting to recover attorneys' fees from the other party as compensation for fees paid in connection with that case. Neither of the cited decisions purported to deal with the type of situation that is present in this case, where Fairway's breach of contract resulted in a lawsuit brought by a third party against Malouf. Similarly, the recovery of costs statute cited by Fairway *allows* the recovery in a case of costs incurred in that case, but does not *prohibit* the recovery of damages in a case to compensate for costs incurred in a previous case.

Secondly, the overwhelming general rule is that the victim of a breach of contract may recover damages from the breaching party to compensate for attorneys' fees and costs expended by the victim to defend a separate suit brought against it as a foreseeable result of the breach. *Restatement of Contracts* § 334 (1932); 22 Am.Jur.2d *Damages* § 166 (1965). Annot. 4 A.L.R.3d 270 (1965). The Arizona Supreme Court has expressly approved of this general rule:

> Another noteworthy exception to the general rule is stated in 15 Am.Jur., Damages, Sec. 144: "It is generally held that where the wrongful act of the defendant has involved the plaintiff in litigation with others or placed him in such relation with others as makes it necessary to incur expense to protect his interest, such costs and expenses, including attorneys' fees, should be treated as the legal consequences of the original wrongful act and may be recovered as damages."

Illustrative of the application of this exception is the case of *Massachusetts Bonding & Ins. Co. v. Lentz*, 40 Ariz. 46, 9 P.2d 408.

*United States Fidelity & Guaranty Co. v. Frohmiller*, 71 Ariz. 377, 380, 227 P.2d 1007, 1009 (1951). *Cf. Treat v. Nowell*, 37 Ariz. 290, 298, 294 P. 273, 276 (1930). We believe that this rule clearly applies to this case and that the trial court was fully justified in awarding damages to Malouf to compensate it for its attorneys' fees and costs in defending the prior lawsuit.

## X. EXCLUSION OF JERRY MALOUF'S TESTIMONY

In the trial court, the parties vigorously disagreed whether the contract included certain tenant layouts and whether Malouf had ever properly agreed to pay extra sums for the tenant layout work performed by Fairway and its subcontractors. Malouf contended that its president, W. B. Malouf, had, on several occasions, orally told Fairway's president, Alfred Tibshraeny "to stick to the architect's plans" and that no extra costs were to be incurred above the contract amount. Because W. B. Malouf was dead at the time of trial, Malouf attempted to prove that W. B. Malouf made these statements to Alfred Tibshraeny through the testimony of W. B. Malouf's son, Jerry, who was present when some of the statements were made. Fairway interjected a hearsay objection to any testimony by Jerry Malouf as to the content of W. B. Malouf's statements to Alfred Tibshraeny. The trial court sustained the objection, but allowed Malouf to elicit Jerry Malouf's testimony in an offer of proof. On appeal, Malouf contends that Jerry Malouf's testimony detailing W. B. Malouf's statements to Alfred Tibshraeny was not hearsay, and that the trial court committed reversible error when it sustained the hearsay objection.

We have carefully reviewed the testimony in question and agree with the trial court's determination that it was hearsay. "Hearsay evidence is a statement, oral or written, made at a time when there was no opportunity to cross-examine the declarant and offered to prove the truth of the words spoken or written." *United States Fidelity & Guaranty Co. v. Davis*, 3 Ariz.App. 259,

261, 413 P.2d 590, 592 (1966). W. B. Malouf's statements that Fairway should stick to the architect's plans and that no extra costs were to be incurred could only have been offered to the trial court for the purpose of proving that Malouf had not authorized and was unwilling to pay extra costs. Consequently, the statements were offered to prove the truth of the words spoken by W. B. Malouf, and, since there was no opportunity to cross-examine him, Jerry Malouf's testimony as to the content of his father's statements was hearsay. The trial court did not commit error by excluding Jerry Malouf's testimony.

## XI. ALLEGED $6,186.50 ERROR IN JUDGMENT

Malouf contends that the trial court's award to Fairway for amounts due under the office building contract will result in an excess payment to Fairway of $6,186.50 for the office building. For clarity, we will set forth a simplified version of Malouf's argument in numbered paragraphs:

(1) The total contract price for the office building was $1,279,000. (This fact is undisputed).

(2) $1,285,186.50 was placed in the office building construction escrow account, and this entire sum was disbursed during the project. (These facts are also undisputed).

(3) Fairway alleged, and the trial court agreed, that certain disbursements from the escrow account, totaling $98,429.89, should not have been made from the account as those expenses were attributable to the owner, not Fairway. In paragraph 1 of the judgment, the trial court awarded Fairway $98,429.89 to compensate it for the disbursements from the escrow account.

(4) This award, together with the amounts already disbursed to Fairway, will result in an overpayment to Fairway, on the basis of the following calculations:

| STEP | | |
|---|---|---|
| 1. | TOTAL AMOUNTS DISBURSED FROM ESCROW | 1,285,186.50 |
| 2. | AMOUNTS PROVEN TO HAVE BEEN WRONGFULLY PAID OUT OF THE ESCROW ACCOUNT | −98,429.89 |
| 3. | AMOUNT DISBURSED FROM ESCROW TO FAIRWAY, OR ON FAIRWAY'S BEHALF | 1,186,756.61 |
| 4. | DAMAGES AWARDED TO FAIRWAY FOR WRONGFUL PAYMENTS OUT OF ESCROW ACCOUNT | + 98,429.89 |
| 5. | TOTAL FAIRWAY WILL RECEIVE UNDER THE CONTRACT IF THE $98,429.89 AWARD IS NOT REDUCED | 1,285,186.50 |
| 6. | THE CONTRACT PRICE | −1,279,000.00 |
| 7. | ALLEGED OVERPAYMENT | 6,186.50 |

On the basis of this argument, Malouf contends that the award of $98,429.89 must be reduced by $6,186.50 so that Fairway nets only that amount provided for in the contract.

We believe that there is a defect in Malouf's argument, at step 3 of the calculations set forth above. Malouf has cited no evidence in the record which clearly shows that $1,186,756.61 was in *fact* disbursed to Fairway or on its behalf in connection with the office building contract. Further, the mere fact that Fairway proved that $98,429.89 was wrongfully disbursed from the escrow account does not necessarily mean that that was the entire sum of wrongful disbursements. Indeed, the fact that there were some wrongful disbursements at all would certainly justify suspicion by the trial court that there may have been other such disbursements. Finally, we have examined Exhibit 41, the escrow account records, and the testimony of Bernadine Lane, an employee of the company which managed the construction escrow, and find that that evidence is inconclusive as to how much money was disbursed to Fairway or on its behalf.

In sum, we believe that there was reasonable evidence to support the $98,429.89 award, and that the evidence did not require the trial court to reduce this figure by $6,186.50 to avoid an alleged overpayment to Fairway.

## XII. ARCHITECTURAL FEES

■ As noted in the previous section, the trial court apparently agreed with Fairway that certain Malouf Towers Project expenses were erroneously charged to Fairway and were wrongfully paid out of the office building construction escrow account. The major expense in this category was $72,899.89 for architectural fees for the office building. The court awarded this sum as damages to compensate Fairway for this wrongful disbursal of escrow account funds. On appeal, Malouf contends that the trial court erred by apparently concluding that the architectural fees expense was Malouf's responsibility. Malouf argues that under the office building contract, Fairway was obligated to pay for the architectural fees. Consequently, Malouf contends, it was entirely appropriate that the architectural fees were paid for out of the construction escrow account.

Malouf has framed the issue as one of contract interpretation. See section III, entitled "The Garage Roof (Canopy)," *supra*, for applicable review rules. As a preliminary matter, we must determine which documents form the contracts in question. As we noted in the introduction of this case, the office building contract consists of "The Standard Form of Agreement Between Owner and Contractor," the "General Conditions," and other documents. There is also another written contract, entitled "Construction Escrow Instructions," dated six days later than the building contract. The escrow instructions contract was executed by Malouf, Fairway, the mortgagee, and the escrow agent. This document incorporates by reference another document entitled "Construction Escrow Project Cost Analysis," hereinafter referred to as Exhibit 60. Exhibit 60 was a confidential report prepared and executed by Fairway and submitted to the escrow agent.[2]

Malouf apparently contends in its brief that all of the contract documents described

are parts of *one* contract, and must be construed as a whole, citing *Bullfrog Marina, Inc. v. Lentz*, 28 Utah 2d 261, 501 P.2d 266 (1972). The contention that there is only one contract is incorrect, for Malouf and Fairway are the only parties to the office building contract, whereas the mortgagee and escrow agent joined Malouf and Fairway as parties to the escrow instructions contract. Further, neither contract attempts to incorporate the other, and their intended purposes are very different. Consequently, it is clear that there are two separate contracts. Further, while we acknowledge the doctrine that, in some situations, contract documents executed close in time and related to one transaction are construed together even though they relate to more than one contract, 17 Am.Jur.2d *Contracts* § 264 (1964); 17A C.J.S. *Contracts* § 298 (1963), we need not discuss the doctrine here because its application to this case would not affect our analysis. We will, therefore, consider each contract separately.

We have examined the documents forming the office building contract and conclude, as a matter of law, that that contract did not obligate Fairway to pay for architectural fees. The interpretation of these written documents is a legal question to be determined independently by this Court, *Polk v. Koerner, supra*, on the basis of the plain and unambiguous terms of the documents. 17A C.J.S. *Contracts* § 296(1) (1963). These documents create absolutely no obligation of Fairway to pay for architectural fees.

The escrow instructions contract is less clear. Exhibit 60, which is Fairway's Project Cost Analysis and is part of this contract, contains an entry for architectural fees as a "Cost Description." Further, $81,-000.00 was listed as the cost for architectural fees, and this figure was included as part of the total estimated cost of the project.

2. We note that Exhibit 53, a letter signed by Alfred Tibshraeny on behalf of Fairway several days after the contracts were executed, is not a part of either written contract. This letter, which states that Fairway would pay for architectural fees, is merely extrinsic evidence which the trial court could not consider until and unless one or both of the contracts was ambiguous.

Malouf argues strenuously that these facts establish a contractual obligation of Fairway to pay for the fees. However, in our judgment, that document does not contain a clear or unambiguous undertaking by Fairway to pay for the fees. The fact that fees are listed as a cost item merely suggests—and certainly does not prove—that Fairway was to pay for the fees out of the price it was to be paid under the office building contract. None of the other escrow instructions contract documents resolves this uncertainty. Consequently, we believe that, as a matter of law, the escrow instructions contract documents are ambiguous on the point under discussions. *See Slater v. Westland, supra.*

The resolution of this ambiguity is a fact question for the trier of fact if there is a conflict in the evidence. *Miller Cattle Co. v. Francis, supra.* In the instant case, there is a conflict in the evidence. The Project Cost Analysis is not mentioned in the office building contract and it is not signed by any party other than Fairway; furthermore, it is designated "confidential." While the trial court could have properly considered it as an, admission by a party in resolving the ambiguity, it, also, could have believed the testimony of the President of Fairway that he authorized the payment of architectural fees from the escrow in order to help Malouf's strained financial condition at the time construction started. (As noted before, the President of Fairway and the principals of Malouf are relatives).

We find no error in the trial court's resolution of this ambiguity. Fairway was not contractually obligated to pay for the architectural fees. Since this was Malouf's obligation, Fairway was entitled to be reimbursed for the fees paid. Consequently, the award of $72,899.89 to Fairway is affirmed.

## XIII. TENANT LAYOUTS

As part of its claim against Malouf, Fairway alleged that it built certain tenant layouts in the office building at the oral request of Malouf, and not as part of the construction contract. Consequently, it sought an award to compensate it for the extra work it had performed on the office building. The trial court apparently accepted Fairway's argument and awarded it $47,259.29 for the extra work. On appeal, Malouf contends that this award was improper because the contracts required Fairway to build tenant layouts without extra compensation.

Malouf relies on a provision of the Standard Form, the basic document of the office building construction contract, as support for its position. That provision, included in Article 2 on page 2, states that "Remaining floors [are] to be completed, according to tenant requirements, but in no case later than December 1, 1965." Malouf concedes that, at the time Fairway submitted its bid, and later, at the time the Standard Form was executed, there were no specific tenant layout plans in existence. However, it notes that typical tenant layouts were included in the plans drawn before the execution of the Standard Form and were incorporated by reference into the Standard Form. Specific tenant layouts were drawn after the execution of the contract, although Malouf expressly concedes that these specific plans are not part of the office building construction contract.

We have examined all of the documents forming the office building construction contract, including the provision cited by Malouf and quoted above, and believe that, as a matter of law, the contract is ambiguous as to whether it required Fairway to construct the tenant layouts without additional compensation. In reaching this conclusion, we are particularly influenced by the fact that no specific tenant layouts had been drawn at the time the contract was executed. It seems highly unlikely that Fairway would execute a contract with a sum certain contract price if the contract required it to build tenant layouts in accordance with plans to be drawn in the future. In our opinion, the provision quoted above may relate only to Fairway's obligations as to time of completion, and does not clearly determine what the contract required Fairway to construct.

Since the contract is, as a matter of law, ambiguous on the point under discussion, it was for the trier of fact, here the trial court, to resolve that ambiguity on the basis of evidence outside the written documents. *Miller Cattle Co. v. Francis, supra.* Parol evidence may be considered. *Standage Ventures, Inc. v. State, supra.* We believe that the trial court's apparent resolution of the ambiguity in favor of Fairway was amply supported by reasonable evidence.

Malouf also contends that the escrow instructions contract documents, specifically Exhibit 60, support its argument that Fairway was contractually obligated to build the tenant layouts without additional compensation. Exhibit 60, a confidential cost analysis, was generally described in the preceding section. Malouf points to certain cost description entries in Exhibit 60 which relate to tenant layout materials and labor. The estimated cost for these tenant layout expenses is included in the total estimated project construction cost. While these entries suggest that Fairway may have been obligated under the contract to build certain tenant layouts for no extra compensation, the entries certainly do not, by their terms, obligate Fairway to do so. Further, the entries do not designate what type of layout Fairway was obligated to construct. In short, the escrow instructions contract is ambiguous and the trial court, as trier of fact, had the right and obligation to resolve this issue by considering parol and other extrinsic evidence. We believe that there was substantial evidence to support the court's resolution of the ambiguity in favor of Fairway's contention that the contract did not require it to build tenant layouts without additional compensation.

For the reasons stated above, we reject Malouf's contentions that the award for tenant layouts was contrary to and ignored Fairway's contractual obligations. That award is affirmed.

### XIV. MECHANICS' LIEN

After making its various awards to the two parties, the trial court set off the total amount due Malouf against the total amount due Fairway. This resulted in a net amount due Fairway of $90,188.76. The trial court decreed that Fairway has a mechanics' lien against Malouf's interest in the Malouf Towers Project property in that net amount.

On appeal, Malouf contends that the mechanics' lien should not have been granted on the entire net amount due. The total amount awarded Fairway included $72,-899.89 to compensate Fairway for the disbursal of office building construction escrow funds for architectural fees and $4,277.00 to compensate Fairway for engineering fees paid for out of the garage construction escrow account. Malouf contends that no mechanics' lien could be decreed as to these sums because they compensated Fairway for its expenses for *professional services.* As support for this proposition, Malouf relies upon the general Arizona rule that the mechanics' liens law does not apply to professional services, citing *Waara v. Golden Turkey Mining Co.,* 60 Ariz. 252, 135 P.2d 149, 149 A.L.R. 677 (1943); *Phoenix Title & Trust Co. v. Garrett,* 73 Ariz. 55, 237 P.2d 470 (1951); and *Hulsey v. La Mance,* 73 Ariz. 430, 242 P.2d 554 (1952). Finally, Malouf argues that the total amount of awards to Fairway for professional services, $77,176.89, should have been deducted from the total net amount due Fairway, $90,188.76, before the mechanics' lien was awarded. Consequently, Malouf requests that this Court reduce the principal sum of the lien amount to the difference between the two figures, $13,-011.87.

Fairway disputes only that part of Malouf's analysis which indicates that the *Waara* line of case applies here. *Waara, Garrett,* and *Hulsey,* Fairway notes, were cases where a party *who had performed professional services* sought to enforce a mechanics' lien to obtain payment for those services. Fairway attempts to differentiate this case by arguing that the $77,176.89 it received was not compensation for professional fees but, rather, compensation for sums improperly deducted from the amounts it had earned under the contracts.

Since the amounts it earned under the contracts fell within the lien statute, Fairway concludes that the $77,176.89 was eligible for a mechanics' lien and the award of the mechanics' lien was proper.[3]

While Fairway correctly argues that the $77,176.89 did not strictly compensate it for professional services rendered, we believe that the monetary awards take on the character of the initial underlying transactions for purposes of determining whether the awards fall within the mechanics' lien statute. The underlying transactions were the performance of *professional* architectural and engineering services by the firms hired for those purposes. Those firms' claims for payment were, in effect, transferred to Fairway when it paid the firms for their services. The mere fact that the claims were transferred to Fairway, an entity which may assert mechanics' liens for manual services it actually performs, does not change the fact that the claims originated with the performance of *professional* services which do not come within the mechanics' lien statute. We believe that any other rule would lead to abuse for it would induce the assignment of claims based on services not within the statute to persons or firms whose own services do fall within the statute.

In sum, we believe that Fairway cannot claim a lien for the two awards totaling $77,176.89 since those awards are based on claims which originated with the performance of professional services. The principal amount of Fairway's mechanics' lien shall be reduced to $14,011.87.[4]

---

3. We have found no legal support for Fairway's novel suggestion that a transferee of a claim for payment for services which are not within the mechanics' lien statute may, by virtue of the transfer, claim a mechanics' lien for the services simply because the transferee's own services are generally within the statute. In fact, there is considerable authority that an assignee of a claim for payment for services which are within the statute cannot claim a mechanics' lien even though the party performing the services could have claimed the lien. 53 Am.Jur.2d *Mechanics' Liens* § 79 (1970).

## XV. INTEREST

The parties assert numerous challenges to the trial court's awards of interest. Most of these challenges involve the issue of prejudgment interest on the awards to Fairway. After describing what the trial court's judgment did concerning interest, we will consider the issues raised.

The trial court made four basic monetary awards to Fairway. First, the court awarded Fairway a substantial amount as due under the office building contract. This amount due resulted from the fact that certain expenses which were Malouf's responsibility were wrongfully paid out of the construction escrow account. This amount was offset by a sum to compensate Malouf for the fact that Fairway neglected to perform certain work required by the contract. This net award was to bear interest from September 1, 1965, the date of occupancy of the building. Second, the court awarded Fairway an amount as payment for extra work it had performed at Malouf's oral request. Various parts of this award were to bear prejudgment interest from various dates in 1965, 1966 and 1967. Third, the court awarded Fairway an amount as due under the garage contract, with prejudgment interest to accrue from September 1, 1965. Fourth, the trial court awarded Fairway $4,277.00 to compensate it for the fact that engineering fees were paid for out of the garage escrow account. This award was divided into five parts, with each part to bear prejudgment interest from a specific date.

---

4. This figure is calculated as follows:

| | | |
|---|---|---|
| Net amount due Fairway under trial court's judgment | | 90,188.76 |
| Increase in net amount due Fairway by virtue of the modification in the judgment ordered in relation to the vault door, *supra* | + | 1,000.00 |
| | | 91,188.76 |
| Awards for professional services not within the mechanics' lien statute | − | 77,176.89 |
| Total net principal amount for which Fairway has a mechanics' lien | | $14,011.87 |

Malouf received two monetary awards from the trial court. First, it received an award for the cost of repairing the defective marblecrete fascia on the office building. Second, it received an award for its consequential damages resulting from the marblecrete failure. Malouf was not allowed prejudgment interest on either award.

After making the various described awards, the trial court offset the awards in the following language:

11. That the total amount of $74,-618.69 due to Defendant-Counterclaimant MALOUF TOWERS RENTAL CO., INC. be set off against amounts due to Plaintiff-Counterdefendant FAIRWAY BUILDERS, INC., resulting in a new amount due to Plaintiff-Counterdefendant FAIRWAY BUILDERS, INC. in the sum of $90,188.76, which money judgment shall bear interest at the rate of six (6%) percent per annum from and after dates due until paid as set forth herein.

It is clear from the portions of the judgment described and quoted above that the judgment is somewhat confusing and perhaps internally contradictory. For example, the trial court's awards to Fairway indicate that prejudgment interest was to be calculated on the entire amounts of those awards. In contrast, paragraph 11 seems to indicate that, to the extent possible, Fairway's awards are to be offset by all of Malouf's awards before prejudgment interest is calculated. We will attempt to clarify the situation through our discussion of the issues raised by the parties.[5]

### A. PREJUDGMENT INTEREST ON THE TRIAL COURT'S AWARDS OF EXTRAS

 Malouf raises two challenges to the trial court's awards of prejudgment interest on the sums it awarded Fairway for extra work. First, Malouf contends that prejudgment interest was improper because the sums awarded for extras were not liquidated until judgment. It is, of course, the rule in Arizona that prejudgment interest may not be awarded unless the claim for payment is liquidated prior to judgment. *Banner Realty, Inc. v. Turek*, 113 Ariz. 62, 546 P.2d 798 (1976); *Costanzo v. Stewart Title & Trust of Phoenix*, 23 Ariz.App. 313, 533 P.2d 73 (1975). Malouf argues that Fairway's claims for extras could not be liquidated until judgment because they were based on a *quantum meruit* theory, citing *Schwartz v. Schwerin*, 85 Ariz. 242, 336 P.2d 144 (1959).

We reject Malouf's attempt to characterize Fairway's extras claims as based on *quantum meruit*. Fairway's clear trial theory, which the trial court apparently accepted, was that there was an oral contract between the parties providing that Fairway would perform extra work with compensation at cost plus ten percent. This theory is clearly supported by the testimony by Leroy B. Malouf, one of the officers of Malouf. The compensation formula proffered by Fairway certainly provides a basis for precisely calculating the amounts claimed for extra work once that extra work had been completed. This is all that is required for those claims to be liquidated. *Banner Realty, Inc. v. Turek, supra; Costanzo v. Stewart Title & Trust of Phoenix, supra.* Cf. *Homes & Son Construction Co., Inc. v. Bolo Corp.*, 22 Ariz.App. 303, 306, 526 P.2d 1258, 1261 (1974), where this Court recognized that a cost-plus claim could be liquidated.

Malouf also contends that prejudgment interest could properly accrue on the awards for extra work only from the time that Fairway filed its complaint, June 27, 1968, since that was the first time Fairway demanded payment for the claims for extra work. We agree with Malouf's basic argument for the following reasons.

 It is the recognized general rule that prejudgment interest on liquidated claims cannot be awarded for any period prior to the initial demand for payment of the liquidated claims. Professor Corbin has stated the rule succinctly:

---

5. It bears repeating that paragraph 11 will have to be adjusted in light of our holding that Malouf was not entitled to an award of $1,000 for the vault door. See section I, *supra*, entitled "The Vault Door."

In the case of an unconditional money debt payable on demand but making no provision for the payment of interest, it is generally held that an action for the amount of the debt will lie at once, without making any demand whatever. It is often said that the action operates as a demand. For the purpose of recovering interest as damages, however, there is no breach of contract until after demand has been made. *Interest is recoverable as damages in such cases only from the date of demand; and where the bringing of the action is itself the only demand that is made, interest will be allowed from the date of the writ.*

Corbin, 5 *Corbin On Contracts* § 1046, at 285–6 (1964) (emphasis added, footnotes omitted). *See* 25 C.J.S. *Damages* § 52 a, at 794 (1966). Although we have found no Arizona cases specifically discussing this rule, we believe that it states an entirely reasonable condition precedent to prejudgment interest in cases where no definite time for payment is stated. Consequently, we hold that in such cases prejudgment interest cannot be awarded on a liquidated claim for the period prior to the creditor's initial demand of the debtor payment of the claim.

In this case, we have found no evidence, and Fairway has cited no evidence, which indicates that it ever *specifically* demanded payment of any one or more of its *specific* claims for extra work at any *specific* time prior to the filing of its amended complaint on July 26, 1971. We have examined the testimony cited by Fairway in its brief and it merely indicates that copies of invoices for some of the extra work *may* have been sent to Malouf. The testimony clearly does not indicate whether a demand was made for payment of any particular claim or even if or when the invoices for a particular claim were sent to Malouf.

In light of our conclusions in the preceding paragraph, we believe that there is no evidence that Fairway demanded payment from Malouf of its claims for extra work on or before the dates from which prejudgment interest accrued under the trial court's judgment. Consequently, there is no reasonable evidence to support the prejudgment interest portions of the awards for extra work.

Malouf suggests that prejudgment interest accrued on the awards for extra work as of the filing of Fairway's initial complaint on June 27, 1968. However, neither that complaint nor the first amended complaint, filed March 31, 1969, contained any claims for payment for extra work. Such claims first appeared in the second amended complaint, filed July 26, 1971. We believe that constitutes Fairway's earliest demand for payment of its claims for extra work so that prejudgment interest on those claims could accrue only from that date. On remand, the trial court shall modify the judgment in accord with this holding.

### B. IS THE PREJUDGMENT INTEREST CALCULATED BEFORE OR AFTER THE PARTIES' AWARDS ARE OFFSET?

Fairway contends that paragraph 11 of the judgment, set forth above, requires that the parties' awards be offset before prejudgment interest is calculated on the difference. Further, Fairway alleges that this approach is erroneous because it is entitled to prejudgment interest on all of its awards before the parties' awards are offset to reach a net difference. We agree that the trial court's judgment orders an offset of the parties' total awards before prejudgment interest is calculated, but we believe that this order is only partially incorrect. At the end of this subsection we will attempt to more precisely indicate how the prejudgment interest should be calculated.

The trial court apparently believed that all of Fairway's awards were for liquidated claims, since it awarded prejudgment interest on all of the awards. The evidence supports this holding. Malouf's awards were for unliquidated claims, and no prejudgment interest was allowed or allowable. In this situation, what effect do the unliquidated counterclaim offsets have on Fairway's right to prejudgment interest on its

various claims? Clearly, the fact that Fairway's awards for liquidated claims are to be offset by awards for unliquidated counterclaims does not make Fairway's claims unliquidated or preclude the award of prejudgment interest. *Homes & Son Construction Co., Inc. v. Bolo Corp.*, 22 Ariz.App. 303, 306, 526 P.2d 1258, 1261 (1974); *Hansen v. Covell*, 218 Cal. 622, 629, 24 P.2d 772, 775–6, 89 A.L.R. 670, 675 (1933). However, if the unliquidated counterclaim offsets are attributable to the same contracts which are the basis of the primary liquidated claims, those claims and the unliquidated counterclaims are offset and prejudgment interest is allowed only on the net difference. We stated this rule in *Homes & Son Construction Co., Inc. v. Bolo Corp., supra,* 22 Ariz.App. 306–7, 526 P.2d at 1261–2:

> It appears to be the well-recognized rule that if the amount due under a contract is ascertainable, but is reduced by the existence of an unliquidated set-off or counterclaim, attributable to the *contract*, interest is properly allowable on the balance found due from the due date. *Farrington v. Freeman,* 251 Iowa 18, 99 N.W.2d 388 (1959); *Fluor Corp. v. United States ex rel. Mosher Steel Co.,* 405 F.2d 823 (9th Cir.), cert. denied, 394 U.S. 1014, 89 S.Ct. 1632, 23 L.Ed.2d 40 (1969) (applying Arizona law); Annot., 89 A.L.R. 678 (1934).

(Emphasis added). California courts have applied this same rule, albeit stated in different terms, to cases where the unliquidated counterclaim offset arises from defective performance of the contract by the party asserting liquidated claims under the contract. *In Hansen v. Covell, supra,* involving a construction contract situation not materially distinguishable from the facts of this case, the California Supreme Court indicated that an unliquidated counterclaim offset in the nature of a *discount* is deducted from the primary liquidated claim *after* prejudgment interest is calculated on the entire amount of the liquidated claim, but that an unliquidated counterclaim offset in the nature of a *payment* is deducted from the liquidated claim *before* any prejudgment interest is calculated, and such interest is calculated only on the difference between the two claims. In the specific case before it, the court held that an unliquidated counterclaim offset arising from defective workmanship under the construction contract was an offset in the nature of a payment. 218 Cal. at 630–31, 24 P.2d at 776, 89 A.L.R. at 676. *Accord, Burgermeister Brewing Corporation v. Bowman,* 227 Cal.App.2d 274, 285, 38 Cal.Rptr. 597, 604 (1964). *See also Phelps Dodge Copper Prod. Corp. v. Alpha Const. Co.,* 203 Kan. 591, 455 P.2d 555 (1969); Annot., 3 A.L.R. 809 (1919); Annot., 89 A.L.R. 678 (1934).

We believe that this Court's statement of the rule in *Homes & Son Construction Co., Inc. v. Bolo Corp., supra,* means the same thing as the California courts' statements of the rule in *Hansen v. Covell, supra,* and *Burgermeister Brewing Corporation v. Bowman, supra.* Thus, an unliquidated counterclaim offset which would be characterized as a payment under the *Hansen* decision would be a counterclaim attributable to the contract under the *Homes & Son* decision.

In this case, Malouf's unliquidated counterclaims are based on Fairway's defective performance of the office building construction contract. These defective workmanship claims would be characterized as a payment of the sums due on that contract under the *Hansen* case, and the awards for those claims would be deducted from Fairway's liquidated claim on that contract, so that prejudgment interest would be allowed only on the difference. We believe that this result is entirely appropriate here, too, under the *Holmes & Son* decision because Malouf's claims for Fairway's defective performance of the office building contract are clearly attributable to that contract. Consequently, Malouf's awards for defective performance of that contract must be deducted from Fairway's award based on that contract before Fairway may be allowed prejudgment interest on that award.

Malouf's unliquidated counterclaims are clearly not attributable to any of the other contracts upon which Fairway's other liquidated claims are based, i. e., the garage

construction contract or the oral contract for extra work. Consequently, the *Homes & Son* decision requires that the awards for those claims accrue prejudgment interest without consideration of Malouf's counterclaims.

In sum, the judgment is to be modified as follows. The award to Fairway for sums due under the office building contract (paragraph 1 of the August 5, 1975 judgment) shall be offset by the awards to Malouf for defective performance of that contract (paragraphs 5 and 6 of the judgment), with prejudgment interest to be allowed on the remainder from September 1, 1965. All other awards of prejudgment interest are affirmed except for those modified in the preceding section dealing with the awards for extra work.

## C. COMPOUND INTEREST

█ Fairway contends that "the prejudgment interest should be compounded." Fairway cites no authority to support this contention and we know of no authority which would allow compound interest.

## XVI. CONCLUSION

The case is remanded for entry of a new judgment in the following respects:

1. Paragraph 1 of the judgment shall be modified to strike the award to Malouf of $1,000.00 for Fairway's failure to install a vault door, and complying modifications of paragraphs 1, 7, and 11 shall be made.

2. Paragraph 7 of the judgment shall be modified by reducing Fairway's lien on Malouf's property to $14,011.87, in accord with our conclusions in section XIV, entitled "Mechanics' Lien."

3. Paragraph 2 of the judgment shall be modified by allowing prejudgment interest on the amounts therein awarded only from July 26, 1971.

4. Paragraph 11 of the judgment shall be modified in accord with our conclusions in Section XV.B, entitled "Is the Prejudgment Interest Calculated Before or After The Parties' Awards are Offset."

In all other respects, the judgment is affirmed.

OGG, C. J., Division 1, concurs.

JACOBSON, J., concurs in the result.